**UNITED STATES of America, Plaintiff–Appellee,**

**United States of America, Counter–Defendant–Appellee,**

v.

Johnny DACCARETT; Francisco J. Palacio; Creaciones Ivonne; Sabmar Ltda; Industrias Marathon Limitada; Comercial Samora Ltda; Emperesa Nelson Gomez, O. "Faster"; Siracusa Trading Corp.; Heriberto Castro Meza and Nelson Gomez, Claimants,

Merrill Lynch Bank, Certain funds contained in Account No. 044000804961700114433 held at The Merrill Lynch Bank 1 Columbus; Pierce, Fenner & Smith; Manufacturers Hanover Trust Company; Southeast Bank & Bank of New York in the Names of Siracusa Trading Corporation; Heriberto Castro–Mesa; Jose Santacruz–Londono; Jaime Vargas; Harold Castro; Jairo Ocampo; Ana Milena Santacruz; Ripon Holdings; Manufacturas de Modas; Confecciones Tio; Manufacturas Samir Ltda; Manufacturas Jolimer Ltda; Barranquilla Industrial Ltda; Industrial Marathon; International Exchange & Investment Corp.; Valery Fashions Ltd.;

---

Comercializadora de Satander Ltda; Manufacturas del Atlantico; Confecciones Elizabeth; Industrial de Confeccion Ltda; Banco Atlantico and All Funds Transferred to Through and or By Merrill Lynch, Pierce Fenner Smith, Inc., Banco Atlantico Manufacturers Hanover Trust Company, Southeast Bank and Bank of New York on Behalf of or for the Benefit of the Aforesaid Claimants to Any All Banks in Colombia and All Bank Accounts Thereof, Including But Not Limited to Banco de Caldas Account Numbers 0999306226 0331, 544–7–1844 and 544–710–844; Banco del Estado Account Number 8900033088; Comercial Costena de Confecciones Ltda; Producto & Textiles Columbianos Ltda; Produtexcol Ltda; Gomez Nelson and Costafast, Defendants,

Abuchaibe Hnos. Ltda; Manufacturas Internacionales Ltda; Organizacion J.D. Ltda; Manufacturas JD Ltda; Comercial Samora Ltda; Creaciones Viviana Ltda; Comercial Estrella Ltda; Confecciones y Tejidos Nacionales Ltda; Manufacturera del Atlantico Ltda; Industrias Marathon Limitada; Manufacturas de Modas Ltda; Incolco Ltda; Creaciones Karen; Tote Export Manufacturas Ltda; Creaciones Ivonne; Confecciones Zuny and Valery Fashions, Defendants–Appellants,

Emperesa Nelson Gomez, O.
"Faster" and Costafast,
Counter–Claimants.

Nos. 1264, 1265, Dockets 92–6229, 92–6259.

United States Court of Appeals,
Second Circuit.

Argued April 2, 1993.

Decided Sept. 10, 1993.

Isidoro Rodriguez, Barranquilla, Colombia S.A., for defendants-appellants Manufacturas Internacionales Ltda., Abuchaibe Hons. Ltda., Comercial Samora Ltda., Creaciones Viviana Ltda., Comercial Estrella Ltda., Confecciones y Tejidos Nacionales Ltda., Manufacturera del Atlantico Ltda., Manufacturas JD Ltda., Organizacion JD Ltda., and Industrias Marathon Ltda.

Montgomery Blair Sibley, Miami, FL (Davis, Markel & Edwards, of counsel), for defendants-appellants Confecciones Zuny Ltda., Manufacturas de Modas Ltda., Incolco Ltda., Valery Fashions Ltda., Creaciones Karen, Tote Export Manufacturas Ltda., and Creaciones Ivonne.

Arthur P. Hui, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty. E.D.N.Y., Robert L. Begleiter, Deborah B. Zwany, Jennifer C. Boal, and Gary R. Brown, Asst. U.S. Attys., of counsel), for appellee.

Before: OAKES, PIERCE, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

## INTRODUCTION

Illegal sales of controlled substances generate billions of dollars in revenue every year. Narcotics traffickers continually seek to make their illegal income appear legitimate. When international drug conglomerates attempt to move their profits beyond the reach of law enforcement authorities, their monies are frequently funneled through financial institutions in the United States. Money laundering has become so sophisticated

> that it is not unusual to find an intricate web of domestic and foreign bank accounts, dummy corporations and other business entities through which funds are moved, almost instantaneously, by means of electronic fund transfers.

House Committee on Banking, Finance and Urban Affairs, H.R.Rep. No. 746, 99th Cong., 2d Sess. 16 (1986). The arteries of international banking systems have become the "lifeblood" of the international drug trade. *See* 132 Cong.Rec. S9938, S9986 (daily ed. July 31, 1986); President's Comm'n on Organized Crime, *The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering* 4–8 (1984).

In an attempt to stop the flow of illicit money back to drug suppliers, congress in the past decade has passed several acts aimed at drug-trafficking and money-laundering activities. *See, e.g.,* International Narcotics Control Act of 1992, Pub.L. No. 102–583, 106 Stat. 4914, *codified at* 12 U.S.C. § 635, 22 U.S.C. §§ 2151, 2291; Money Laundering Control Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207, *codified at* 18 U.S.C. §§ 1956, 1957. While a money-laundering conviction results in automatic forfeiture to the government of any property involved in the offense, *see* 18 U.S.C. § 982(a), the government can also institute civil forfeiture proceedings without first obtaining a conviction. *See* 18 U.S.C. § 981. This case tests the effectiveness of civil forfeiture as a tool for seizing and forfeiting proceeds of narcotics trafficking as they pass through our banking system.

## FACTS AND BACKGROUND

There are two groups of claimants: the "Atlantico Claimants", consisting of Manufacturas Internacionales Ltda., Abuchaibe Hnos. Ltda., Comercial Samora Ltda., Creaciones Viviana Ltda., Comercial Estrella Ltda., Confecciones y Tejidos Nacionales Ltda., Manufacturera del Atlantico Ltda., Manufacturas J.D. Ltda., Organizacion J.D. Ltda., and Industrias Marathon Ltda.; and the "Barranquilla Claimants", consisting of Confecciones Zuny Ltda., Manufacturas de Modas Ltda., Incolco Ltda., Valery Fashions Ltda., Creaciones Karen, Ltda., Tote Export Manufacturas Ltda., and Creaciones Ivonne Ltda. Both sets of claimants appeal from a final judgment and other rulings of the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Judge,* following a jury verdict that forfeited to the government more than $10,000,000, pursuant to 18 U.S.C. § 981 and 21 U.S.C. § 881. *United States v. All Funds on Deposit in Any Accounts Maintained at Merrill, Lynch, Pierce, Fenner & Smith,* 801 F.Supp. 984 (E.D.N.Y.1992) (*All Funds* ) (technical amendment to opinion filed on Sept. 14, 1992).

The forfeitures arose out of an international effort to impede the drug-trafficking and money-laundering activities of the Cali cartel, a Colombian conglomerate headed by José Santacruz–Londono, which allegedly imports approximately 3000 kilograms of cocaine a month into the United States. The cartel uses bank accounts throughout the United States, Europe, and Central and South America to store and move its narcotics proceeds. Its funds are moved through various international banks by means of electronic funds transfers (EFTs) for ultimate deposit into Colombian bank accounts.

When a customer wants to commence an EFT, its bank sends a message to the transfer system's central computer, indicating the amount of money to be transferred, the sending bank, the receiving bank, and the intended beneficiary. The central computer then adjusts the account balances of the sending and receiving banks and generates a printout of a debit ticket at the sending bank and a

credit ticket at the receiving bank. After the receiving bank gets the credit ticket, it notifies the beneficiary of the transfer. If the originating bank and the destination bank belong to the same wire transfer system, then they are the only sending and receiving banks, and the transfer can be completed in one transaction. However, if the originating bank and the destination bank are not members of the same wire transfer system, which is often the case with international transfers, it is necessary to transfer the funds by a series of transactions through one or more intermediary banks.

The seizures at issue were precipitated by the arrests of three Santacruz–Londono associates in Luxembourg on June 28 and 29, 1990. These men had opened hundreds of bank accounts throughout Europe and deposited large sums of money in them for the Cali cartel. Anticipating that these arrests would trigger an effort by the cartel to move its monies to Colombia before they could be confiscated, Luxembourg law-enforcement authorities requested the assistance of several countries to freeze monies related to the cartel. During July and August 1990, a flurry of electronic funds transfers from the suspect accounts ensued, resulting in the seizure of $30 million in Europe, $16 million in Panama, and $12 million in the United States.

The $12 million seized in the United States was the aggregate of dozens of EFTs sent through New York City intermediary banks that had correspondent banking relationships with Panamanian and Colombian banks, including Banco Atlantico, Manufacturers Hanover, The Bank of New York, and Merrill Lynch. After receiving the subject EFTs, the intermediary banks were supposed to credit the accounts of designated correspondent Colombian banks; the Colombian banks were then supposed to notify the beneficiaries that the funds were available. However, through both oral orders and a series of eight arrest warrants *in rem*, government agents instructed the intermediary banks in New York to attach "all funds" on deposit in the names of various individuals and entities connected with Santacruz–Londono and "all related entities and individuals", and to in-

form the agents about all transfers that were destined for a third-party beneficiary in Colombia. The intermediary banks complied with the agents' directions; they initially froze the seized funds and later transferred them to the clerk of the court who now holds them pending the outcome of this appeal.

Each successive warrant included more names. If the government agents seized funds destined for a corporation not yet named in the complaint, it would amend the complaint to add that corporation's name soon after the seizure. By the seventh amended complaint and its accompanying warrant, all but one of the claimants in this action were explicitly named. The Drug Enforcement Agency ("DEA") also subpoenaed from the intermediary banks financial records of any accounts related to the entities named in the complaint.

The ten Atlantico Claimants and seven Barranquilla Claimants (collectively "claimants"), purportedly Colombian clothing export companies, were the intended beneficiaries of the seized EFTs. They filed claims to approximately $6.5 million of the seized funds, denied all of the allegations in the *in rem* complaint, and claimed that their monies had been derived from legitimate sales of clothing. The Atlantico Claimants also brought two counterclaims, seeking damages for alleged violations of the fourth and fifth amendments, of the Electronic Communications Privacy Act, *see* 18 U.S.C. §§ 2510–2520 and §§ 2701–2710, of the Right to Financial Privacy Act, *see* 12 U.S.C. §§ 3401–3422, of the Federal Tort Claims Act, *see* 28 U.S.C. §§ 2671–2680, and of the civil forfeiture statutes, *see* 21 U.S.C. § 881; 18 U.S.C. § 981. Their counterclaims were dismissed before trial.

In a related action, claimants sued the intermediary banks in the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Judge*, for loss of the use of their funds and violation of various federal and state statutes. Judge Weinstein granted summary judgment for the banks, holding that they could not be held liable for following government orders respecting claimed government funds. *Manufacturas International, Ltda v. Manufacturers Hano-*

*ver Trust Co.,* 792 F.Supp. 180, 196 (E.D.N.Y.1992) (*Consolidated Bank Cases*).

In still another related action, claimants sued the United States attorneys who had ordered the banks to seize the funds; Judge Weinstein dismissed that suit for failure to state a claim. *Abuchaibe Hnos. v. Maltz,* No. 92 Civ. 528 (E.D.N.Y. Mar. 11, 1992) (oral decision).

On May 13, 1991, after an *ex parte, in camera* hearing, Magistrate Judge A. Simon Chrein found that the government had shown in this civil forfeiture proceeding probable cause "to believe that the defendant funds constitute the proceeds of narcotics trafficking and/or money laundering" under 21 U.S.C. § 881(i) and 18 U.S.C. § 981(g). Two weeks later, Judge Weinstein held a three-day evidentiary hearing in which he also determined that there was probable cause to believe the funds were forfeitable. Claimants' motions to vacate the probable-cause finding and to suppress evidence obtained by the DEA subpoenas were denied on February 19, 1992.

On March 9, 1992, a two-month jury trial began. The government presented extensive evidence, including corporate and banking records from all over the world and the testimony of witnesses familiar with the Cali cartel's operations. That evidence linked Santacruz–Londono's drug proceeds to various Panamanian and Colombian shell corporations. The claimants tried to show that the monies were the legitimate profits from sales of clothing made in Colombia and Panama. They claimed that massive shipments of clothing were handed over to ship captains who toured the Caribbean islands, trading some for produce, livestock, and currency, losing some in transit, having some stolen, and finally disposing of the remainder of the shipments through charitable means. *All Funds,* 801 F.Supp. at 992.

The jury found that eighteen of the twenty-two amounts seized were forfeitable. For the remaining amounts, the jury found that those claimed by Manufacturas J.D. Ltda. and Organizacion J.D. Ltda. were not traceable proceeds of illegal money-laundering and narcotics transactions, and that Confecciones Elizabeth Ltda. was an innocent owner. Af-

ter the trial, those claimants who received an adverse jury decision moved for judgment notwithstanding the verdict and for a new trial; both motions were denied. Judge Weinstein ordered the release of the amounts found not to be forfeitable and stayed execution of the forfeitures pending this appeal. Most of the claimants have appealed. However, Siracusa Trading Company, a claimant whose funds were seized from Merrill Lynch's office in Columbus, Ohio, and Confecciones Elizabeth Ltda., the claimant found to be an innocent owner, did not appeal.

Comercial Samora, one of the Atlantico Claimants, has also appealed, although it did not participate in the civil forfeiture trial. On the first day of the trial, Comercial Samora withdrew its verified claim and all other papers that it had filed in the proceedings. Judge Weinstein consequently entered a separate judgment of forfeiture on June 5, 1992, against the $124,000 originally claimed by Comercial Samora; in his August 5, 1992, opinion, Comercial Samora is noticeably absent from the list of claimants at trial. *All Funds,* 801 F.Supp. at 992. Nevertheless, Comercial Samora has appealed with the rest of the Atlantico Claimants from the August 5, 1992, judgment; it did not file a separate brief on appeal, and no separate arguments were made on its behalf.

The claimants, including the two whose funds were found not to be the proceeds of illegal drug trafficking, raise numerous issues on appeal, challenging the validity of the seizures and pleadings, various aspects of the trial, dismissal of the counterclaims, and the district court's allowance of the execution of an IRS levy. For the reasons stated below, we affirm.

## DISCUSSION

The conceptual underpinnings of civil forfeiture can be traced back to ancient Roman and medieval English law, both of which made objects used to violate the law subject to forfeiture to the sovereign. *See United States v. 785 St. Nicholas Ave.,* 983 F.2d 396, 401–02 (2d Cir.) (*St. Nicholas Ave.*) (discussing historical origins of forfeiture), *cert. denied,* — U.S. ——, 113 S.Ct. 2349, 124

L.Ed.2d 258 (1993). Our laws providing for official seizure of property used in criminal activity perpetuate the legal fiction that "property used in violation of law was itself the wrongdoer that must be held to account for the harms it had caused." *United States v. 92 Buena Vista Avenue*, —— U.S. ——, ——, 113 S.Ct. 1126, 1135, 122 L.Ed.2d 469 (1993) (*Buena Vista Ave.*). Because the property, or *res,* is considered the wrongdoer, it is regarded as the actual party to *in rem* forfeiture proceedings. *Id.*

Civil forfeiture has recently gained new life as an instrument of federal law enforcement, particularly as a weapon in the "war on drugs". As part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, congress strengthened civil forfeiture as a means of confiscating illegal substances and the means by which they are manufactured and distributed. Pub.L. No. 91–513, 84 Stat. 1276 (1970), *codified at* 21 U.S.C. §§ 801 et seq. In 1978 congress amended the act to authorize the seizure and forfeiture of the proceeds of illegal drug transactions as well. The statute provides for the forfeiture of "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance [as well as] *all proceeds traceable to such an exchange.*" Pub.L. No. 95–633, 92 Stat. 3777 (1978), *codified at* 21 U.S.C. § 881(a)(6) (emphasis added).

Now "one of the most potent weapons in the judicial armamentarium", *see United States v. 384–390 West Broadway,* 964 F.2d 1244, 1248 (1st Cir.1992) (*West Broadway* ) (discussing widespread use of *in rem* proceedings against drug offenders), civil forfeiture has become a favored method for imposing significant economic sanctions against narcotics traffickers. However, the ease with which the government can seize property and the potential hardships caused to innocent owners who seek to recover their property once the government has seized it have elicited concern from courts and commentators alike. Given that the reach of civil forfeiture is constantly expanding to new realms—in this case, to electronic funds transfers between banks—the courts must ensure that constitutional and procedural safeguards remain intact.

## A. *Seizures.*

There are three ways the government can institute civil forfeiture *in rem* proceedings under 21 U.S.C. § 881. First, it can follow the process set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rules"). 21 U.S.C. § 881(b). Second, it can obtain a seizure warrant in the manner provided for in the Federal Rules of Criminal Procedure, which requires a finding of probable cause *ex parte* by a judicial officer. Fed.R.Crim.P. 41(c). Third, it can seize property without judicial process "when the Attorney General has probable cause to believe the property is subject to civil forfeiture." 21 U.S.C. § 881(b)(4). *See St. Nicholas Ave.,* 983 F.2d at 402 (discussing three options); *United States v. 4492 S. Livonia Rd.,* 889 F.2d 1258, 1262–63 (2d Cir.1989) (*Livonia Rd.*) (same). In this case, the government used the first and third options, neither of which requires pre-seizure judicial approval. *See United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties,* 941 F.2d 1428, 1432 n. 5 (11th Cir.1991).

■ Before analyzing the validity of the seizures here, we note that even when the initial seizure is found to be illegal, the seized property can still be forfeited. *See United States v. $37,780 in United States Currency,* 920 F.2d 159, 163 (2d Cir.1990) (holding that "illegal seizure of property does not immunize that property from forfeiture"). This is because seizure and forfeiture are two distinct events. While both require the government to have probable cause, the consequences of a lack of probable cause may differ depending on the event. Absence of probable cause at the time of the seizure may result in the suppression of evidence in later proceedings, but the defendant property itself cannot be suppressed from the forfeiture action. *See id.* In contrast, a failure to establish probable cause on the forfeiture issue will preclude forfeiture of the property altogether. *See* discussion Part B, *infra.*

*1. Compliance with Supplemental Rules.*

The seizures of at least nine of the EFTs followed the process prescribed by the Supplemental Rules. Under the Supplemental Rules, the government begins by filing a verified complaint in the district where the seizure (arrest of the property) will occur. Supp.Rule C(2). Ordinarily, the court must review the papers before authorizing an arrest warrant *in rem. See* Supp.Rule C(3). However, in actions for "forfeitures for federal statutory violations", as in this case, *"the clerk,* upon filing of the complaint, shall forthwith issue a summons and warrant for the arrest of the * * * property without requiring a certification of exigent circumstances." *Id.* (emphasis added).

Claimants argue that the *in rem* complaints failed to comply with the particularity requirements for pleadings set forth in the Supplemental Rules. Two rules address the level of particularity required in forfeiture complaints. Rule C(2) states that the complaint "shall describe with reasonable particularity the property that is the subject of the action." Rule E(2)(a) specifies that the complaint must "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."

■ These standards are more stringent than the general pleading requirements set forth in the Federal Rules of Civil Procedure, *see Livonia Rd.,* 889 F.2d at 1266, an implicit accommodation to the drastic nature of the civil forfeiture remedy. *West Broadway,* 964 F.2d at 1248; *see also* 12 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3242 (1973). The particularity-of-pleading requirements in forfeiture cases provide a "way of ensuring that the government does not seize and hold, for a substantial period of time, property to which, in reality, it has no legitimate claim." *Livonia Rd.,* 889 F.2d at 1266 (quoting *United States v. Pole No. 3172, Hopkinton,* 852 F.2d 636, 638 (1st Cir.1988)).

The complaint does not have to meet the ultimate trial burden of showing probable cause for forfeiture; it simply needs to estab-lish a "reasonable belief that the government can show probable cause for forfeiture at trial." *United States v. U.S. Currency, in the Amount of $150,660.00,* 980 F.2d 1200, 1204–05 (8th Cir.1992). In other words, the complaint need not allege facts sufficient to show that specific property is tainted, but facts sufficient to support a reasonable belief that the government can demonstrate probable cause for finding the property tainted. *Id.* at 1205; *see also United States v. One Parcel of Real Property,* 921 F.2d 370, 376 (1st Cir.1990); *Pole No. 3172, Hopkinton,* 852 F.2d at 640.

Claimants contend that the *in rem* complaints did not contain a particular description of the funds to be seized or sufficient allegations to link the funds to illegal drug activity. More specifically, they argue that the use of the phrase "all related entities and individuals" in the complaint unduly broadened the scope of the warrant and impermissibly gave the government "full discretion" to seize whatever property it desired.

■ Whether a forfeiture complaint is sufficiently particularized to reach a given piece of property is an issue of law subject to plenary review. *West Broadway,* 964 F.2d at 1248; *U.S. Currency, in the Amount of $150,660.00,* 980 F.2d at 1204. In determining whether a complaint satisfies rule E(2)(a), a court may also consider supporting affidavits that may cure a lack of particularity in the complaint itself. *Livonia Rd.,* 889 F.2d at 1266.

If the complaint had described the subject properties as simply "all funds on deposit in any accounts maintained * * * in the name[ ] of * * * José Santacruz–Londono" and "all related entities and individuals", without more, then the claimants' arguments might be well taken. However, given that the names of the claimants were gradually added by the successive amendments to the complaint, we will discuss in this section here only those seizures that were preceded by a complaint and arrest warrant that explicitly named the intended beneficiary. All other seizures, that is, those made before the complaint and arrest warrant specifically mentioned the EFT's intended beneficiary, will

be treated as warrantless seizures, which are discussed in the next section. This approach will obviate any dependence on the "related parties" language in the warrant.

■ The successive complaints name as defendants "all funds on deposit" in certain banks "in the names of" various named claimants, "including, but not limited to" specific account numbers. The complaints allege that Santacruz–Londono "caused substantial sums of monies" from narcotics trafficking and money laundering to be transferred through accounts, "including the defendant accounts", and credited to accounts, including those of various named claimants. In addition, an International Letter Rogatory from the Eastern District of New York is incorporated by reference and attached to the complaint. It describes in greater detail the government's investigation since 1979 of Santacruz–Londono, the arrests of the three cartel members in Luxembourg, and the use of Colombian shell corporations for disguising the illegal nature of the narcotics proceeds.

By naming both the intermediary banks through which the funds were to be transferred and the intended beneficiaries of the EFTs, the complaint described the subject property with "reasonable particularity". See Supp.Rule C(2). By recounting Santacruz–Londono's activities and methods of funneling his narcotics proceeds through various New York banks for ultimate deposit in Colombian bank accounts, the complaint states "the circumstances from which the claim arises" with sufficient particularity for the claimants to "commence an investigation of the facts and frame a responsive pleading". See Supp.Rule E(2).

In this case, the claimants filed verified claims and responsive pleadings to the Seventh Amended Complaint in rem without moving for a more definite statement. We conclude that the complaints and their accompanying warrants of arrest complied with the pleading requirements of the Supplemental Rules.

## 2. Seizure without Judicial Process.

At least eleven of the amounts were seized either without a warrant or prior to the issuance of a warrant that explicitly named the intended beneficiary of the EFT. We will analyze all such seizures as warrantless seizures. When the "Attorney General has probable cause to believe" that property is subject to forfeiture under § 881, the government is authorized to seize the property without judicial process. 21 U.S.C. § 881(b)(4).

■ Therefore, the question is whether the assistant United States attorneys, as representatives of the Attorney General, had "probable cause to believe" that the EFTs were "subject to civil forfeiture under [§ 881]" at the time they requested the intermediary banks to attach the subject EFTs. Clearly they did. This is not a case in which the government "stumbled" into a seizure without any prior information about the subject property. See, e.g., $37,780 in United States Currency, 920 F.2d at 163 (holding that DEA agents at airport lacked probable cause to seize money from claimant's attaché case at time of seizure). Instead, they knew that Santacruz–Londono, who had already been indicted in this country for various narcotics and money-laundering violations, would probably be directing the transfer of illicit income through particular New York banks to the accounts of several of his "businesses" in Colombia.

There are two additional statutory requirements for seizures without judicial process. First, after seizure the government must institute forfeiture proceedings "promptly". 21 U.S.C. § 881(b). Second, the proceedings should follow applicable customs laws, 21 U.S.C. § 881(d), which are found at 19 U.S.C. §§ 1595a to 1615. In this case, the government satisfied both requirements. It filed a civil forfeiture complaint within days of each warrantless seizure, and the resulting forfeiture proceeding followed the applicable customs laws.

## 3. Fourth–Amendment Concerns.

Claimants argue that their fourth-amendment rights were violated in three instances: (1) when EFTs were seized without a warrant; (2) when EFTs were seized pursuant to a rule C(3) warrant without a prior judicial

determination of probable cause; and (3) when the government gained access to their financial records from the intermediary banks without a warrant.

The fourth amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, * * * and particularly describing the place to be searched[ ] and the * * * things to be seized." U.S. Const. amend. IV.

### a. *The Warrant Requirement.*

■ We first address the fourth amendment's applicability to warrantless seizures made pursuant to 21 U.S.C. § 881(b)(4). While some circuits have held that the fourth amendment's warrant requirement is inapplicable in light of the statute's plain language allowing seizure without judicial process, *see, e.g., United States v. One 1977 Lincoln Mark V Coupe*, 643 F.2d 154, 158 (3d Cir.) (only need probable cause, not a warrant, because property subject to forfeiture is contraband), *cert. denied*, 454 U.S. 818, 102 S.Ct. 97, 70 L.Ed.2d 88 (1981); *United States v. One 1978 Mercedes Benz*, 711 F.2d 1297, 1302 (5th Cir.1983) (warrantless seizure of automobile pursuant to § 881(b)(4) does not offend fourth amendment); *United States v. Valdes*, 876 F.2d 1554, 1557 (11th Cir.1989) (warrantless seizure of automobiles used to facilitate drug transaction did not violate fourth amendment), this circuit requires seizures made pursuant to § 881(b)(4) to comport with the fourth amendment, *see, e.g., United States v. LaSanta*, 978 F.2d 1300, 1304–05 (2d Cir.1992) (warrantless seizure of vehicle must meet a recognized exception to fourth amendment); *cf. In re Application for Warrant to Seize One 1988 Chevrolet Monte Carlo*, 861 F.2d 307, 311 (1st Cir.1988) (fourth amendment applies to forfeiture seizures); *United States v. Linn*, 880 F.2d 209, 215 (9th Cir.1989) (same).

■ Therefore, to be valid the warrantless seizures must fall within one of the recognized exceptions to the fourth amendment's warrant requirement. *LaSanta*, 978 F.2d at 1305. The government argues that the exi-

gent-circumstances exception justifies any warrantless seizures made in this case. They claim that EFTs can be "completed in a matter of minutes or hours", and therefore present "greater exigencies than the seizure of a conveyance[ ] or perhaps[ ] any other kind of property". Because the property at issue was fungible and capable of rapid motion due to modern technology, we are satisfied that exigent circumstances were present here. The seizures made pursuant to § 881(b)(4), therefore, did not violate the fourth amendment.

### b. *The Probable–Cause Requirement.*

■ With respect to the EFT seizures that were made pursuant to an *in rem* warrant, claimants argue that because the warrants were issued "forthwith" by a "clerk of the court", without a preceding probable-cause determination, *see* Supp.Rule C(3), they failed to satisfy the fourth amendment's probable-cause requirement. Several courts have held the Supplemental Rules' summary-warrant procedures unconstitutional. *See, e.g., United States v. Life Ins. Co.*, 647 F.Supp. 732, 742 (W.D.N.C.1986) ("without a determination of probable cause by a qualified judicial officer, [§] 881(b) violates the Warrants clause of the Fourth Amendment"); *United States v. $128,035 in U.S. Currency*, 628 F.Supp. 668, 672–73 (S.D.Ohio) ("procedure authorized by § 881(b) runs afoul of minimal Fourth Amendment procedural requirements"), *appeal dismissed*, 806 F.2d 262 (6th Cir.1986). Other courts have held that *in rem* warrants are not true "warrants" subject to fourth-amendment strictures. *See, e.g., United States v. TWP 17 R 4*, 970 F.2d 984, 987–89 (1st Cir.1992) (posting an *in rem* warrant on property not a seizure for purposes of fourth amendment); *United States v. Turner*, 933 F.2d 240, 245 (4th Cir.1991) (*in rem* warrant more analogous to a summons, not a "warrant" within the meaning of fourth amendment).

In this circuit, just as warrantless seizures under § 881(b)(4) must satisfy the fourth amendment, so must seizures made with warrants pursuant to the Supplemental Rules. Therefore, although the plain language of

§ 881(b) allows for the issuance of a warrant without probable cause, *see, e.g., One 1978 Mercedes Benz,* 711 F.2d at 1302 ("If [Attorney General] lacks probable cause * * * he may file a verified complaint pursuant to the maritime rules and effect the seizure pursuant to that process"), the fourth amendment mandates the existence of probable cause at the time of seizure. *$37,780 in U.S. Currency,* 920 F.2d at 163 (fourth amendment requires government to have probable cause at the time it seizes money). However, the government need not obtain a *judicial* determination of probable cause prior to seizure. While "absent an 'extraordinary situation' a party cannot invoke the power of the state to seize a person's property without a *prior* judicial determination that the seizure is justified", the Supreme Court has held that "such an extraordinary situation exists when the government seizes items subject to forfeiture." *United States v. Eight Thousand Eight Hundred & Fifty Dollars,* 461 U.S. 555, 562 n. 12, 103 S.Ct. 2005, 2011 n. 12, 76 L.Ed.2d 143 (1983) (citing *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974)).

Therefore, the government must have probable cause at the time the clerk issues the warrant *in rem,* but need not demonstrate that it had probable cause at the time of the seizure unless a claimant challenges the validity of the seizure. As discussed in section 2 above, the government had probable cause to believe that the defendant funds were the proceeds of illegal narcotics trafficking at the time they were seized.

c. *Privacy Interests in Financial Records.*

■ Finally, claimants argue that the DEA's subpoenas of all the financial records at the intermediary banks relating to the EFTs violated their fourth-amendment rights. The government contends that the claimants do not have any protectable fourth-amendment interest in the bank records at issue, because they are not customers of the intermediary banks. We agree. Claimants hold accounts with Colombian banks, which have accounts with the intermediary banks. The claimants' relationship with the intermediary banks is too remote to afford the claimants any legitimate expectation of privacy in information about EFTs being received by the intermediary banks.

■ Even if claimants had their own accounts with the intermediary banks, information regarding those accounts would not be protected by the fourth amendment. In *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), the Supreme Court held that a bank customer had no "protected Fourth Amendment interest" in the copies of checks and other records the bank retained. *Id.* at 440, 96 S.Ct. at 1622. The Court stated that the fourth amendment " 'at the most guards against * * * too much indefiniteness or breadth in the things required to be "particularly described," if * * * the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant.' " *Id.* at 445–46, 96 S.Ct. at 1625 (quoting *Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 208, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946)).

The Court reinforced *Miller* in *S.E.C. v. Jerry T. O'Brien, Inc.,* 467 U.S. 735, 104 S.Ct. 2720, 81 L.Ed.2d 615 (1984), where the Securities and Exchange Commission had subpoenaed an individual's financial records from two broker-dealer firms. The Court held that the individual had no fourth-amendment claim, because once he gave his financial information to someone else, "even on the understanding that the communication [wa]s confidential," he could not object if the third party conveyed that information to law-enforcement authorities. *Jerry T. O'Brien, Inc.,* 467 U.S. at 743, 104 S.Ct. at 2725 (citing *Miller,* 425 U.S. at 443, 96 S.Ct. at 1624). The Court also noted that a "target" of an investigation has no right to notice of subpoenas issued to third parties. *Id.* 467 U.S. at 742–43, 104 S.Ct. at 2725.

Because the DEA was authorized to demand information regarding the EFTs from the intermediary banks and the materials requested were relevant to their investigation, we conclude that no fourth-amendment violation occurred here.

4. *Right to Financial Privacy Act.*

The Right to Financial Privacy Act ("RFPA") prohibits "financial institutions"

from giving the government access to "the information contained in the financial records of any customer" absent a search warrant, subpoena, court order, formal written request, or customer authorization. 12 U.S.C. § 3402. Congress enacted the RFPA in part as a response to *Miller*, 425 U.S. 435, 96 S.Ct. 1619. *See* H.R.Rep. No. 1383, 95th Cong., 2d Sess. 34 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9273, 9306; *see also United States v. Mann*, 829 F.2d 849, 851 (9th Cir. 1987); *Duncan v. Belcher*, 813 F.2d 1335, 1337 (4th Cir.1987). However, the "most salient feature of the Act is the narrow scope of the entitlements it creates", because congress wanted to "minimize[ ] the risk that customers' objections to subpoenas will delay or frustrate agency investigations." *Jerry T. O'Brien, Inc.*, 467 U.S. at 745–46, 104 S.Ct. at 2727.

If the government gains access to financial records through a warrant, subpoena, court order, or written request, it must give the financial institution's "customer" simultaneous notice of the access. *See* 12 U.S.C. § 3405(2) (administrative subpoena and summons); 12 U.S.C. § 3406(b) (search warrant); 12 U.S.C. § 3407(2) (judicial subpoena); 12 U.S.C. § 3408(4)(A) (formal written request). In this case, however, the DEA's subpoenas "for all financial records" of "any and all accounts related to" the claimants explicitly instructed the intermediary banks not to disclose the existence of their requests.

The Barranquilla Claimants contend that since they were not given notice of the government's access to the financial records, the evidence obtained from the subpoenas should have been suppressed at trial. The Atlantico Claimants argue that Judge Weinstein improperly dismissed their counterclaim alleging that the government and the intermediary banks were liable under the RFPA for disclosing information about the EFTs.

█ In response to both arguments, the government maintains that the claimants are not protected by the RFPA, because they are not "customers" of the intermediary banks. Under the RFPA, a "customer" is "any *person* or authorized representative of that person who utilized or is utilizing any service of a financial institution * * * in relation to an account maintained *in the person's name.*" 12 U.S.C. § 3401(5) (emphasis added). A "person" is defined as "an individual or a partnership of five or fewer individuals." 12 U.S.C. § 3401(4). Thus, the act is limited to individual customers and small partnerships; corporations are not protected. *See, e.g., Pittsburgh National Bank v. United States,* 771 F.2d 73 (3d Cir.1985); *Spa Flying Service, Inc. v. United States,* 724 F.2d 95 (8th Cir.1984) (per curiam); *see also Jerry T. O'Brien, Inc.,* 467 U.S. at 745, 104 S.Ct. at 2727 (RFPA "carefully limits the kinds of customers to whom it applies").

The government notes that the claimants are all corporations and therefore are not protected by the RFPA. It is unclear from the record on appeal whether the claimants are partnerships or corporations. If they are corporations, as they alleged in the district court, then they are not protected by the RFPA. If they are partnerships, as they now claim on appeal, we would need to remand so that the district court could obtain proof to that effect; however, a remand is not necessary, because there are alternate grounds that preclude the application of the RFPA.

█ Even if the claimants are in fact small partnerships rather than corporations, the government contends that they still would not be protected by the RFPA, because they do not hold accounts *in their names* at the banks as required by 12 U.S.C. § 3401(5). The funds were not seized from accounts held in the various claimants' names, but were the proceeds of wire transfers that were designated to be credited to the accounts of Colombian banks maintained at the intermediary banks.

In response, claimants argue that once the EFTs were intercepted by the intermediary banks, the frozen funds were held by those banks under the claimants' names. At that point, claimants contend, they had "accounts" in their names at the banks. While claimants present a creative interpretation of an "account", the seized funds were being held by the banks until the forfeiture trial at the request of the government, not the claimants. The RFPA is meant to protect those who

maintain accounts in their names at financial institutions. *Duncan*, 813 F.2d at 1338 (definition of customer turns on "whether the individual maintains the financial account in his or her name only"); *Ridgeley v. Merchants State Bank*, 699 F.Supp. 100, 102 (N.D.Tex.1988). Because the funds were being held in custody at the banks pursuant to an arrest warrant, we conclude that the claimants never *maintained* accounts in their names at the intermediary banks.

■ Finally, the government contends that even if there had been a statutory violation of the RFPA, exclusion of the financial records from trial would not have been a permissible remedy. Because the RFPA states that civil penalties are "the only authorized" remedy for its violation, *see* 12 U.S.C. § 3417(d), it would be inappropriate for the courts to imply a suppression remedy as well. *United States v. Frazin*, 780 F.2d 1461, 1466 (9th Cir.) (only remedy under RFPA is provided in statute), *cert. denied*, 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986); *see also United States v. Thompson*, 936 F.2d 1249, 1252 (11th Cir.1991) (courts should not imply a suppression remedy unless statute specifically refers to exclusionary rule), *cert. denied*, ——. U.S. ——, 112 S.Ct. 975, 117 L.Ed.2d 139 (1992).

In short on this point, because the RFPA does not protect the claimants, the Atlantico Claimants' counterclaim was properly dismissed, and the financial records were properly admitted at trial.

### 5. *Authorization for DEA Subpoenas.*

The Barranquilla Claimants also claim that the financial records should have been suppressed at trial because the DEA did not follow proper administrative procedures for issuing the subpoenas. Specifically, they argue that John Maltz, whose rubber-stamped signature is on the subpoenas, did not have the authority to issue the subpoenas, and that even if he did, he failed to personally determine whether the subpoenas were "relevant or material" to investigations conducted under the Comprehensive Drug Abuse Prevention and Control Act of 1970, as required by 21 U.S.C. § 876(a). *See United*

*States v. Hossbach*, 518 F.Supp. 759, 765–66 (E.D.Pa.1980).

■ Section 876(a) authorizes the Attorney General to issue subpoenas for "relevant or material" information; the Attorney General may in turn delegate this subpoena power to any DEA officer or employee. *See* 21 U.S.C. § 878(a)(2); *see also United States v. Mountain States Tel. & Tel. Co.*, 516 F.Supp. 225, 229 n. 2 (D.Wyo.1981). The relevant federal regulation authorizes, among others, all Special Agents-in-Charge and Assistant Special Agents-in-Charge to issue subpoenas. 28 C.F.R. § 0.104, App. to Subpart R, Sec. 4(a).

Maltz was the Associate Special Agent-in-Charge of the New York Drug Enforcement Task Force, a position not specifically included in the regulation's list. The Barranquilla Claimants argue that any subpoena issued by Maltz was therefore unauthorized. As an *Associate* Special Agent-in-Charge, however, Maltz supervises nine *Assistant* Special Agents-in-Charge, agents who are specifically authorized to issue subpoenas under the regulation. During Maltz's eight years as an Associate Special Agent-in-Charge, internal New York Drug Enforcement Task Force procedures have required all administrative subpoenas to bear his signature. Since Maltz has the same authority as an Assistant Special Agent-in-Charge, plus additional supervisory responsibilities, we agree with Judge Weinstein that Maltz's exercise of the subpoena power was proper. *See Hossbach*, 518 F.Supp. at 765–66 (upholding validity of subpoenas issued by either agents-in-charge or acting agents-in-charge).

■ The Barranquilla Claimants further argue that Maltz never "issued" the subpoenas because they simply bear his rubber-stamped signature; nor is there any indication that Maltz personally determined that the information sought was "relevant or material" to an investigation. Judge Weinstein called the DEA's procedures in this respect "dangerous" and recommended that the government review its system for issuing DEA administrative subpoenas, but he denied the claimants' motion to suppress. We find no error in his ruling. Nothing in the statute, regulations, or caselaw requires a handwrit-

ten, rather than a rubber-stamped, signature on the subpoena. More significantly, even if the initial subpoenas were defective, the financial records at issue would have been introduced at trial anyway, because they were procured through other means as well. Both the government and the claimants served the intermediary banks with deposition and trial subpoenas for the same documents.

### 6. Electronic Communications Privacy Act.

Claimants argue that the EFTs were protected under the Electronic Communications Privacy Act of 1986 ("ECPA"), which amended Title III of the Omnibus Crime Control and Safe Streets Act of 1968, often called the wiretap act. 18 U.S.C. §§ 2510–20. The ECPA updated the wiretap act to add prohibitions against the interception of "electronic communications" to the already existing prohibitions against interceptions of oral and wire communications. *See* 18 U.S.C. § 2510(12). The Barranquilla Claimants maintain that the district court should have suppressed evidence of the EFTs since they were seized in violation of the ECPA. The Atlantico Claimants contend that the complaint should have been dismissed because the *in rem* warrants did not satisfy the ECPA, and that for the same reason the district court erred in dismissing their counterclaim under the ECPA.

First, we must determine whether the ECPA is applicable to this case. The statute is directed at regulating surveillance activities. However, the ECPA's legislative history indicates that congress intended to protect "funds transfers among financial institutions". S.Rep. No. 99–541, 99th Cong., 2d Sess. 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3562. There are no cases that apply the ECPA to an electronic funds transfer between banks or to a seizure of funds after the transfer is complete. For purposes of this appeal, however, we assume that the ECPA may apply to EFTs. Before considering the statute's applicability to these transfers, we first take up other issues raised by the district court.

Judge Weinstein addressed the ECPA at length in *Consolidated Bank Cases,* 792 F.Supp. at 190–93, and briefly in *All Funds,* 801 F.Supp. at 995–96. Relying on the "relation-back" doctrine, *see* 18 U.S.C. § 981(b); 21 U.S.C. § 881(h), he held that the ECPA was inapplicable because "in forfeiture proceedings tainted property is considered forfeited at the moment the illegal act is committed." *All Funds,* 801 F.Supp. at 995–96. Because ownership was transferred instantly at the moment of criminality, he found that the government "reasonably viewed the funds as its own" at the time of seizure. *Id.* at 996 (quoting *Consolidated Bank Cases,* 792 F.Supp. at 192).

However, since Judge Weinstein's decision, the Supreme Court has clarified the parameters of the relation-back doctrine in *United States v. 92 Buena Vista Avenue,* —— U.S. ——, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993). There, the government initiated a civil forfeiture proceeding against land allegedly purchased with proceeds of illegal drug trafficking. The claimant, who had purchased the land with money her friend had given to her, maintained that she was an innocent owner because she did not know the money was traceable to narcotics transactions. The district court held that, under the relation-back doctrine, title to the land vested in the government at the moment the illegal drug transaction proceeds were used to pay the purchase price. Therefore, because the claimant had purchased the land after the acts giving rise to the forfeiture had occurred, she had never owned the land.

The Supreme Court disagreed, holding that the government could not "profit from the common-law doctrine of relation back until it has obtained a judgment of forfeiture." *Id.* —— U.S. at ——, 113 S.Ct. at 1137. Otherwise, it would be impossible to launch an innocent-owner defense, which was specifically provided for at 21 U.S.C. § 881(a)(7). The relation-back doctrine is one of "*retroactive* vesting of title that operates only upon entry of the judicial order of forfeiture or condemnation." *Id.* —— U.S. at ——, 113 S.Ct. at 1138 (Scalia, J., concurring).

In light of *Buena Vista*, Judge Weinstein's application of the relation-back doctrine was incorrect. Because the government cannot contend that it owns the defendant properties until a judgment of forfeiture is entered against them, we must examine the ECPA's applicability to the EFTs.

■■ The ECPA prohibits interceptions of electronic communications, *see* 18 U.S.C. § 2511(1), but no "device" was used to obtain the information as contemplated by the ECPA. The statute defines "intercept" as

the aural or other acquisition of the contents of any wire, electronic, or oral communication *through the use of any electronic, mechanical, or other device.*

18 U.S.C. § 2510(4) (emphasis added). Liability under the ECPA is therefore predicated on the use of a "device". *See United States v. Turk*, 526 F.2d 654, 658 (5th Cir.) (act requires "contemporaneous acquisition of the communication through the use of the device"), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). Because the government did not use any type of "device" to obtain the EFTs and information, no "interception" occurred.

The district court, therefore, properly rejected all of the claimants' arguments under the ECPA.

### 7. *Wire Transfer as a Res.*

■■ Claimants argue that EFTs are not seizable properties for purposes of the civil forfeiture statutes because they are merely electronic communications. They claim that an EFT is not a direct transfer of funds, but rather a series of contractual obligations to pay. Furthermore, they define an EFT as "an intangible property, which not only cannot be stopped once transmitted, but the Intermediary Bank upon accepting it cannot alter from the instructions contained therein." Finally, they claim that only after a transmission is complete and the communication is accepted and received by the beneficiary does it become a seizable *res.*

Section 881 of Title 21 provides for the seizure of "moneys, negotiable instruments, securities, or other things of value * * * all proceeds traceable" to narcotics transactions.

21 U.S.C. § 881(a)(6). Similarly, 18 U.S.C. § 981(a)(1)(A) provides for the seizure of "any property, real or personal, involved in a transaction or attempted transaction * * * or any property traceable to such property."

The claimants' conception of the intermediary banks as messengers who never hold the goods, but only pass the word along, is inaccurate. On receipt of EFTs from the originating banks, the intermediary banks possess the funds, in the form of bank credits, for some period of time before transferring them on to the destination banks. While claimants would have us believe that modern technology moved the funds from the originating bank through the intermediary bank to their ultimate destination without stopping, that was not the case. With each EFT at least two separate transactions occurred: first, funds moved from the originating bank to the intermediary bank; then the intermediary bank was to transfer the funds to the destination bank, a correspondent bank in Colombia. While the two transactions can occur almost instantaneously, sometimes they are separated by several days. Each of the amounts at issue was seized at the intermediary bank after the first transaction had concluded and before the second had begun.

Our decision in *United States v. Banco Cafetero Panama* made it clear that a bank credit is a seizable *res.* 797 F.2d 1154, 1158 (2d Cir.1986) (bank credit is "clearly 'traceable proceeds' under the forfeiture statute") (*Banco Cafetero*). We also held that moving "traceable proceeds" from bank to bank would not insulate them from forfeiture. "Since commingled assets, traceable to drug proceeds, are forfeitable, the bank's money remains vulnerable to forfeiture when the money is moved into its account at a second bank or into a second bank's account at a third bank." *Id.* at 1161; *see also* Joint Explanatory Statement of Titles II and III, Psychotropic Substances Act of 1978, Pub.L. No. 95–633, *reprinted in* 1978 U.S.C.C.A.N. 9518, 9522 ("proceeds * * * involved in intervening legitimate transactions, or otherwise changed in form * * * still * * * subject to forfeiture" as long as "traceable connection to an illegal transaction in controlled substances exist[s]").

Therefore, an EFT while it takes the form of a bank credit at an intermediary bank is clearly a seizable *res* under the forfeiture statutes.

### B. *Probable Cause.*

██ Unless a claimant challenges the validity of the seizure, as in a motion to suppress, the government is not called upon to demonstrate probable cause until trial of the forfeiture action, *see $37,780 in United States Currency,* 920 F.2d at 163 (applying *Banco Cafetero,* 797 F.2d at 1162), or perhaps on a summary judgment motion. Although the government succeeded in two pretrial probable-cause hearings, one before Chief Magistrate Judge Chrein and one before Judge Weinstein, and in a full-blown jury trial, claimants still contend that the government failed to meet its burden of proving probable cause.

██ Both for seizures made under *in rem* warrants and for warrantless seizures under § 881, the government bears the initial burden of establishing probable cause for instituting the forfeiture proceeding, *see* 21 U.S.C. § 881(d) (incorporating customs procedures); 19 U.S.C. § 1615 (customs laws), that is, "probable cause to believe that the properties are the fruits of illegal drug activity". *See United States v. 228 Acres of Land and Dwelling Located on Whites Hill Road,* 916 F.2d 808, 811–12 (2d Cir.1990) (*Whites Hill*), cert. denied, 498 U.S. 1091, 111 S.Ct. 972, 112 L.Ed.2d 1058 (1991).

██ Since 1986 our caselaw has consistently relied on *Banco Cafetero* for the proposition that, to establish probable cause, the government must have "reasonable grounds" to believe the property is subject to forfeiture, and that these grounds must rise above the level of "mere suspicion". 797 F.2d at 1160. *See, e.g., United States v. 15 Black Ledge Drive,* 897 F.2d 97, 101 (2d Cir.1990) (*Black Ledge Drive*); *Livonia Rd.,* 889 F.2d at 1267; *United States v. One 1986 Mercedes Benz,* 846 F.2d 2, 4 (2d Cir.1988) (per curiam). However, we seem to have recently articulated apparently inconsistent formulations of how far above "mere suspicion" the probable-cause burden lies. While in *United States v. $31,990 in U.S. Currency,* 982 F.2d

851, 854 (2d Cir.1993) (citation omitted), we stated that the "government must have reasonable grounds to believe that 'a substantial connection exists between the money to be forfeited and the exchange of a controlled substance'", in *St. Nicholas Ave.,* 983 F.2d at 403, we said that "[t]here need not be a substantial connection between the drug activities and the property in question, but only a nexus between them." We therefore take this opportunity to resolve this apparent contradiction.

As authority for the "substantial connection" standard, the *$31,990 in U.S. Currency* decision quotes *United States v. United States Currency in the Amount of $228,-536.00,* 895 F.2d 908, 916 (2d Cir.), cert. denied, 495 U.S. 958, 110 S.Ct. 2564, 109 L.Ed.2d 747 (1990), which in turn relies on *Banco Cafetero,* 797 F.2d at 1160. However, *Banco Cafetero* does not state that a "substantial connection" must be shown, only that the government must have "probable cause *to connect* the property with narcotics activity". 797 F.2d at 1160 (emphasis added).

Moreover, on several occasions we have specifically declined to adopt a "substantial connection" standard. *See United States v. 38 Whalers Cove Drive,* 954 F.2d 29, 33 (2d Cir.) (*Whalers Cove*), cert. denied, —— U.S. ——, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992); *Livonia Rd.,* 889 F.2d at 1269; *United States v. One 1974 Cadillac Eldorado Sedan,* 548 F.2d 421, 423 (2d Cir.1977). Our decisions in *$31,990 in U.S. Currency,* 982 F.2d 851, and *United States Currency in the Amount of $228,536.00,* 895 F.2d 908, are the only second circuit cases to the contrary. Examining the facts of those two cases, we note that application of the lower "nexus" standard, rather than the "substantial connection" standard, would not have affected their results.

In *$31,990 in U.S. Currency,* the government failed to establish probable cause to forfeit money seized from the trunk of a cab. 982 F.2d at 854–56. The claimant, who had been a cab fare the day before the seizure, said he had inadvertently left his money in the cab. The government's evidence consisted of the large amount of cash seized, the

manner in which it was packaged, the cab driver's story regarding who owned the money, parallels between the cab's itinerary and that of a drug courier, and the cab driver's possession of half a gram of cocaine. *Id.* at 853–55. None of the people involved had ever been linked to any criminal activity. Not only did the government fail to show a "substantial connection" between the claimant's property and narcotics, we held that the evidence demonstrated "no more than a suspicion" that the money was the proceeds of drug trafficking. *Id.* at 856. It goes without saying that evidence failing to amount to more than "mere suspicion" is incapable of establishing a "nexus".

In *United States Currency in the Amount of $228,536.00,* the evidence supporting probable cause included tape recordings of numerous conversations implicating the claimant in drug trafficking, tax records, and eyewitness testimony detailing the claimant's possession, processing, and sales of large amounts of cocaine. 895 F.2d at 911. Application of the "nexus" standard there would have had no effect, since the government's case satisfied the higher "substantial connection" standard.

Under all these circumstances, we are satisfied that the weight of authority in the second circuit indicates that the government must demonstrate only a "nexus" between the seized property and illegal drug activity, not a "substantial connection". *See St. Nicholas Ave.,* 983 F.2d at 403; *United States v. One 1987 Jeep,* 972 F.2d 472, 476 (2d Cir. 1992); *Whalers Cove,* 954 F.2d at 33; *United States v. One 1974 Cadillac,* 575 F.2d 344, 345 (2d Cir.1978) (per curiam); *One 1974 Cadillac Eldorado Sedan,* 548 F.2d at 423.

To show that nexus when the *res* is a bank account, the government must establish that there is probable cause to believe the funds represent proceeds traceable to drug transactions, *see St. Nicholas Ave.,* 983 F.2d at 403; it is not required to link the monies to any one particular transaction. *See Livonia Rd.,* 889 F.2d at 1269 (citing *Banco Cafetero,* 797 F.2d at 1160). The government must establish "reasonable grounds", based on more than "mere suspicion", that the funds are subject to forfeiture.

*Banco Cafetero,* 797 F.2d at 1160; *Livonia Rd.,* 889 F.2d at 1267. Curiously, this standard of proof can be less stringent than the typical "prima facie proof". *Banco Cafetero,* 797 F.2d at 1160. A finding of probable cause may be based on hearsay, even hearsay from confidential informants, *see Livonia Rd.,* 889 F.2d at 1267, or circumstantial evidence, *see St. Nicholas Ave.,* 983 F.2d at 405, particularly in cases involving bank accounts, money, or other fungible assets. *See id.* ("only proof demonstrating probable cause is likely to be circumstantial, revealing unexplained wealth in conjunction with evidence of drug trafficking").

Claimants argue that the evidence presented here was illegally seized and therefore provided an impermissible basis for a finding of probable cause. As discussed above, however, there is no basis for suppressing the evidence derived from the seizures under either the fourth amendment or federal statutes.

The machinery of our civil forfeiture laws permits the government to seize property without probable cause, institute a civil forfeiture proceeding, and then use civil discovery as a means of accessing information necessary to effect a forfeiture. Because the final probable-cause determination rests on information presented in the forfeiture action, the risk to claimants of being deprived of their property is extremely high. Despite this apparent unfairness, the precedents of this court and the Supreme Court, as well as the relevant statutes and rules, seem to require this result. At this point in the development of forfeiture law, any change in the balance of this unique procedural system must come either from the Supreme Court or from congress.

Claimants also assert that even if the evidence was properly admitted at trial, the government failed to demonstrate "reasonable grounds" for the forfeiture of their funds. Under 21 U.S.C. § 881, probable-cause determinations are "made by the trial court's exercise of its judgment in light of all the circumstances." *St. Nicholas Ave.,* 983 F.2d at 405. The government's case included bank records from around the world; docu-

ments seized by the Colombian National Police from Cali, Colombia; and testimony of former members of the Cali cartel, numerous DEA agents, a Luxembourg police officer, a member of the Internal Revenue Service's criminal investigations division, a United States customs official, and a certified public accountant who reviewed the claimants' business records.

While the claimants argue that the government failed to submit evidence that the "sources" and "destinations" of the seized funds were connected to narcotics activities, the extensive evidence regarding the Santacruz–Londono organization as a whole was more than sufficient to link the defendant funds to illegal drug trafficking. Each one of the claimants was linked to Santacruz–Londono through the testimony of at least one witness. We hold that the district court properly determined that the government had met its burden of establishing probable cause for the forfeitures.

### C. *Shifting Evidentiary Burden.*

■ After the government has established probable cause, the burden shifts to the claimant to "demonstrate by a preponderance of the evidence that the factual predicates necessary to show probable cause have not been met or to show claimant[']s lack of knowledge or consent to drug related activities." *St. Nicholas Ave.*, 983 F.2d at 403; *see Black Ledge Drive*, 897 F.2d at 102; *Livonia Rd.*, 889 F.2d at 1267 ("claimant must prove either that the property was not used unlawfully * * * or that the illegal use was without the claimant's knowledge or consent"); *Banco Cafetero*, 797 F.2d at 1160 (claimant bears "ultimate burden"). If the *res* is a bank account, the claimant bears the burden of proving that the account does not contain proceeds traceable to drug transactions, but rather represents legitimate funds. *St. Nicholas Ave.*, 983 F.2d at 403.

■ Not only does the burden shift to the claimant opposing forfeiture, but the claimant's burden is heavier than the government's. While the government, to establish a prima facie case for forfeiture, need only demonstrate "reasonable grounds", the owner of the seized property must prove that the

defendant property is legitimate "by a preponderance of the evidence", a more stringent standard. *United States v. 303 W. 116th St.*, 901 F.2d 288, 291 (2d Cir.1990).

Judge Weinstein observed that the structure of the civil forfeiture statutes is "inherently unfair to claimants". *All Funds*, 801 F.Supp. at 991. While we also might question the wisdom of forcing the owner of the seized property to prove the property is "innocent", rather than making the government prove the property is "guilty", the constitutionality of congress's allocation of the burdens of proof in forfeiture cases has been upheld. *See Whites Hill Road*, 916 F.2d at 814. We therefore stress the need for courts to ensure that what little due process is provided for in the statutory scheme is preserved in practice. *See* Mary M. Cheh, *Constitutional Limits on Using Civil Remedies to Achieve Criminal Law Objectives: Understanding and Transcending the Criminal–Civil Law Distinction*, 42 Hastings L.Rev. 1325 (1991) (urging attention to civil law due process implications of current forfeiture practices); *see also United States v. All Assets of Statewide Auto Parts*, 971 F.2d 896, 905 (2d Cir.1992) ("We continue to be enormously troubled by the government's increasing and virtually unchecked use of the civil forfeiture statutes and the disregard for due process that is buried in those statutes.").

As the jury's verdict indicates, Manufacturas J.D. Ltda. and Organizacion J.D. Ltda. successfully proved that their monies were not connected to drug activity. In addition, the jury found that Confecciones Elizabeth was an innocent owner. The remaining claimants were unable to show by a preponderance of the evidence that their monies were legitimate. Given that "the evidence of drug tainting was overwhelming" and that the claimants presented "implausible stories" and "inconsistent positions", *see All Funds*, 801 F.Supp. at 992, we find that the remaining eighteen amounts were properly forfeited.

### D. *Other District Court Rulings.*

#### 1. *Sanctioning Counsel.*

■ During discovery, the Barranquilla Claimants requested admissions from the

government regarding numerous historical, social, and cultural aspects of Colombia. Because Chief Magistrate Judge Chrein questioned the relevance of these requests and felt they were frivolous, he directed both parties to brief the issue of appropriate sanctions for Barranquilla Claimants' counsel after the trial. No sanctions were imposed during trial, and ultimately Judge Weinstein denied the government's post-trial motion for sanctions.

On appeal, the Barranquilla Claimants assert that their counsel was "chilled" during the trial by the threat of possible sanctions in violation of their due process rights. The record, however, reveals no evidence that counsel for the Barranquilla Claimants was "chilled" in any way. In the absence of prejudice to the Barranquilla Claimants from Chief Magistrate Judge Chrein's actions, we find no violation of their due process rights.

### 2. *Permitting Expert–Witness Testimony.*

■ The Barranquilla Claimants claim that they were prejudiced by DEA Agent Michaelis's testimony on the subject of money laundering, because it constituted surprise expert testimony. Michaelis was listed on the government's witness list prior to trial, but not as an expert. When Michaelis took the stand, Judge Weinstein qualified him as an expert and allowed him to testify about Santacruz–Londono's overall money-laundering scheme and techniques. The Barranquilla Claimants argue that they were "substantially prejudiced" by this unexpected expert testimony.

■ Under the Federal Rules of Evidence, expert witnesses may testify if their "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Qualified DEA agents who testify as fact witnesses may also give expert opinion testimony about the methods of drug operations. *See United States v. Campino,* 890 F.2d 588, 593 (2d Cir.1989), *cert. denied,* 498 U.S. 866, 111 S.Ct. 179, 112 L.Ed.2d 143 (1990); *United States v. Diaz,* 878 F.2d 608, 617 (2d Cir.), *cert. denied,* 493 U.S. 993, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989). A decision to allow expert testimony is within the broad discretion of the trial judge and "is to be sustained on appeal unless manifestly erroneous." *United States v. Brown,* 776 F.2d 397, 400 (2d Cir. 1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986) (citation omitted). Furthermore, a district court's decision to permit a witness who was not listed in the pretrial order to testify will be upheld absent a clear abuse of discretion. *Dunlap–McCuller v. Riese Org.,* 980 F.2d 153, 158 (2d Cir.1992).

■ A district court judge must frequently make close discretionary calls regarding the admission of evidence in civil forfeiture proceedings. Indeed, the Supreme Court has recently signalled its willingness, at least with respect to expert testimony, to require more active supervision by the district court. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, —— —— ——, 113 S.Ct. 2786, 2796–98, 125 L.Ed.2d 469 (1993). Because in civil forfeiture proceedings the government is far more favored by the rules than in virtually any other type of judicial proceeding, we think district judges, when making evidentiary decisions in these cases, should be mindful of the heavy burden placed on claimants.

Agent Michaelis's testimony included an account of his investigation of Santacruz–Londono and his associates, as well as opinions about their money-laundering activities. Judge Weinstein's determination that his testimony would help the jury was neither "manifestly erroneous" nor a "clear abuse of discretion". Especially in light of the jury instructions explaining that the government had not given Michaelis's expert testimony in writing to opposing counsel when they should have, and that an expert's opinion should not be substituted for the jury's own conclusions, we conclude that the claimants were not prejudiced by Agent Michaelis's testimony.

### 3. *Denial of Motion for Judgment Notwithstanding the Verdict.*

At the end of the trial, Judge Weinstein denied the Atlantico Claimants' motion for a judgment notwithstanding the verdict. *See* Fed.R.Civ.P. 50(b). On appeal, the Atlantico

Claimants contend that the district court erred in denying their motion, because the government presented no evidence connecting their funds with narcotics activity.

■ We review the district court's decision on a motion for judgment notwithstanding the verdict *de novo*. *Song v. Ives Laboratories,* 957 F.2d 1041, 1046 (2d Cir.1992). Therefore, we can disturb the jury's verdict only if we can say, "without considering either the credibility of witnesses or the weight their testimony deserves, that the only conclusion a reasonable factfinder could have reached" is one favoring the Atlantico Claimants. *Enercomp, Inc. v. McCorhill Publishing, Inc.,* 873 F.2d 536, 541 (2d Cir.1989). In other words, there must be " 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or * * * such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.' " *Song,* 957 F.2d at 1046.

Given the overwhelming evidence linking the Atlantico Claimants to drug trafficking and money laundering, the district court properly denied their motion for judgment notwithstanding the verdict.

D. *Internal Revenue Service Levy.*

■ On July 29, 1992, the IRS served a notice of levy on the clerk of the United States District Court for the Southern District of New York to surrender the funds that were about to be released to Manufacturas J.D. Ltda. and Organizacion J.D. Ltda. The IRS asserted that these two claimants were "nominees or alter egos" of Johnny Daccarett, a delinquent taxpayer who owed the IRS in excess of $3 million. Because Judge Weinstein's judgment, dated August 5, 1992, directed the clerk to issue a check for those funds to counsel for the Atlantico Claimants, the clerk requested clarification from the court. At that point the government moved to amend the judgment to direct the clerk to honor the IRS levy. Instead of amending the judgment, Judge Weinstein simply entered an order authorizing the clerk of the court to comply with the levy—which he did, on September 9, 1992.

Manufacturas J.D. Ltda. and Organizacion J.D. Ltda. claim that Judge Weinstein erred in permitting execution of the IRS levy because (1) the government failed to show that it was issued in accordance with 26 U.S.C. § 7429(a); (2) the Anti–Injunctive Act prevents it, 26 U.S.C. § 7421; (3) Johnny Daccarett has no proprietary interest in their businesses; and (4) the government was circumventing the federal interpleader statute and the Federal Rules of Civil Procedure.

In response, the government argues that the only grounds for noncompliance with an IRS levy are that (1) the entity served with the levy is neither "in possession of" nor "obligated with respect to" the requested property, or (2) the taxpayer's property is "subject to an attachment or execution under any judicial process." 26 U.S.C. § 6332. Since the validity of the levy and competing claims to the ownership of the funds are not valid reasons for refusing to honor a levy, the court properly directed the clerk to honor the IRS's levy.

If Manufacturas J.D. Ltda. and Organizacion J.D. Ltda. want to pursue their challenge to the IRS claim, they must bring a separate wrongful levy action. 26 U.S.C. § 7426.

CONCLUSION

As the use of civil forfeiture against the proceeds of narcotics trafficking increases, it is important to remember that the pertinent statutes are not legislated exceptions to the fourth amendment. Given the relative ease with which the statutory scheme allows the government to seize suspect properties, it is imperative for courts to analyze carefully the forfeiture process in light of the fifth amendment's due process demands and the fourth amendment's probable-cause and warrant requirements. Having done so in this case, we conclude that the government carefully complied with both its statutory and constitutional obligations.

Affirmed.