**ORGANIZACION JD LTDA. and Manufacturas JD Ltda., Plaintiffs–Appellants,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE and United States Drug Enforcement Administration, Defendants–Appellees.**

**No. 705, Docket 96–6145.**

United States Court of Appeals, Second Circuit.

Argued Dec. 20, 1996.

Decided Aug. 26, 1997.

Isidoro Rodriguez, Barranquilla, Colombia, for plaintiffs-appellants.

Arthur P. Hui, Assistant United States Attorney, Eastern District of New York (Zachary W. Carter, United States Attorney, Varuni Nelson, Jennifer C. Boal, Assistant United States Attorneys, Eastern District of New York, of counsel), for defendants-appellees.

Before: KEARSE and CABRANES, Circuit Judges, and KELLEHER, District Judge.*

JOSÉ A. CABRANES, Circuit Judge:

■ This is an appeal from the dismissal of a suit against the United States Department of Justice and the United States Drug Enforcement Administration (collectively, the "Government") brought by plaintiffs, two Colombian corporations who were the intended recipients of wire transfers originating in the United States, for alleged violations of their "electronic privacy" following the Government's institution of forfeiture proceedings against certain of plaintiffs' electronically transferred funds. The funds at issue were electronically transferred from banks in Texas to banks in New York,[1] and ultimately were to have been credited to plaintiffs' banks in Colombia.[2] The question presented is whether plaintiffs have standing to bring this suit against the United States under the civil cause of action provision of Title II of the Electronic Communications Privacy Act of 1986 (the "ECPA" or the "Act"), 18 U.S.C. § 2707(a). As an initial matter, we must determine whether a 1996 amendment to that provision applies to cases pending at the time of the amendment's effective date, so as to give plaintiffs standing to bring this suit. Prior to the amendment, 18 U.S.C. § 2707(a) established a civil cause of action for "any provider of electronic communication service, subscriber, or customer" for certain violations of the Act. In 1996, Congress amended

---

* The Honorable Robert J. Kelleher of the United States District Court for the Central District of California, sitting by designation.

1. The electronic fund transfers were sent from El Banquito Latino in Texas to Banco Atlantico, S.A. in New York and from First City bank in Texas to the Bank of New York and to Banco Atlantico, S.A. in New York.

2. Plaintiffs' Colombian banks were Banco de Caldas and Banco del Estado.

§ 2707(a), replacing the word "customer" with the words "other person." *See* Intelligence Authorization Act for Fiscal Year 1997, Pub.L. No. 104–293, § 601(c), *reprinted in* 1996 U.S.C.C.A.N. (110 Stat.) 3461, 3469–70. We conclude that, under controlling authority, the amendment to the Act does not apply to cases pending on its effective date. Further, because plaintiffs are not "customer[s]" of an electronic communication service within the meaning of the statute as it existed prior to the 1996 amendment, they lack standing to bring this action.

## I.

This case has its origins in forfeiture proceedings brought by the Government *in rem* against twenty-two electronic fund transfers. Related appeals previously decided by this Court describe the complex factual history of the case, with which we assume familiarity. *See United States v. Daccarett,* 6 F.3d 37 (2d Cir.1993), *cert. denied,* 510 U.S. 1191, 114 S.Ct. 1295, 127 L.Ed.2d 648 (1994); *Organizacion JD Ltda. v. United States Dep't of Justice,* 18 F.3d 91 (2d Cir.), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2679, 129 L.Ed.2d 813 (1994). The forfeiture proceedings, including the three that are the subject of the instant dispute, were the product of an effort to combat the drug-trafficking and money-laundering activities of the Cali cartel, a Colombian drug trafficking conglomerate. In order to repatriate to Colombia the profits of its illegal activities in this country, the cartel made use of the most advanced means of electronic fund transfers, including transfers from banks in New York City to banks in Colombia. The fund transfers took place in part by means of the "Fedwire" fund transfer mechanism operated by the United States Federal Reserve Banks.[3]

In July 1990, the Government seized twenty-two suspect electronic fund transfers, valued at over twelve million dollars, as those funds moved through various New York "intermediary banks." *See Daccarett,* 6 F.3d at 43–45. After a two-month trial in the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge* ), a jury on May 8, 1992, found that eighteen of those funds were traceable to criminal activities. *See Organizacion JD,* 18 F.3d at 93. The jury determined, however, that the three funds at issue here, valued at approximately $300,000, were not traceable to criminal activities, and those three funds were subsequently released. *See Daccarett,* 6 F.3d at 45. On August 5, 1992, plaintiffs filed the instant suit against the Government and two New York financial institutions, the Bank of New York and Banco Atlantico, S.A. Plaintiffs asserted that the seizures violated the Fourth and Fifth Amendments of the United States Constitution, the ECPA, the Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401–22 ("RFPA"), and, in one count asserted against the banks only, they claimed breach of contract. Plaintiffs sought declaratory relief and compensatory and punitive damages.

In a Judgment and Order entered on December 10, 1992, the district court dismissed the complaint in its entirety. On appeal, we affirmed the dismissal of all claims against the two defendant banks. We also held that in seizing the three funds the Government had not violated the Fourth or Fifth Amendments or the RFPA, and affirmed the dismissal of those claims. *See Organizacion JD,* 18 F.3d at 93–96. We also affirmed the district court's dismissal of so much of the complaint as alleged violations by the Government of Title I of the ECPA, governing interception of communications, 18 U.S.C. §§ 2510–22, but remanded to the district court for a determination of whether plaintiffs had standing to sue under Title II of the ECPA, 18 U.S.C. §§ 2701–11, governing access to certain stored electronic records, and, if so, whether the Government violated Title II. *See Organizacion JD,* 18 F.3d at 95.

On remand, the district court permitted discovery only on the threshold issue of standing, deferring discovery on the question of the Government's liability under Title II of the ECPA until plaintiffs' standing had been established. In August 1995, following the

---

**3.** Fedwire is a fund-transfer system owned and operated by the Federal Reserve Banks. It is used primarily for the transmission and settlement of payment orders. *See* 12 C.F.R. § 210.26(e).

completion of discovery on the standing issue, the Government moved for summary judgment, arguing that plaintiffs did not have standing to sue the Government under Title II of the ECPA. The district court held evidentiary hearings and oral argument on this question and, in a Judgment, Memorandum and Order of April 2, 1996 that examined the language of the ECPA, its legislative history, and the RFPA (on which the ECPA is modeled), concluded that plaintiffs lacked standing. *See Organizacion JD Ltda. v. United States Dep't of Justice,* No. CV–92–3690, 1996 WL 162271, at *6 (E.D.N.Y. April 2, 1996). Accordingly, the court dismissed the remainder of plaintiffs' complaint. This appeal followed.

## II.

As originally amended, § 2707(a) provided a civil action for "any provider of electronic communication service, subscriber, or *customer* aggrieved" by any knowing or intentional act in violation of Title II of the ECPA. (Emphasis added). In October 1996, during the pendency of this appeal, Congress amended § 2707(a) to provide a civil action to "any provider of electronic communication service, subscriber, or *other person* aggrieved" by any knowing or intentional act in violation of Title II. *See* Intelligence Authorization Act for Fiscal Year 1997, Pub.L. No. 104–293, § 601(c), *reprinted in* 1996 U.S.C.C.A.N. (110 Stat.) 3461, 3469–70 (emphasis added). The threshold question presented, therefore, is whether this amended statute should be applied to the instant action.

■■ We are guided by the recent Supreme Court ruling in *Hughes Aircraft Co. v. United States ex rel. William J. Schumer,* —— U.S. ——, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997), which elaborates upon the analytic framework developed in *Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). "When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf,* 511 U.S. at 280, 114 S.Ct. at 1505. If Congress has done so, we need not recur

to judicial "default rules." Absent a clear expression of congressional intent, however, "the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair the rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* There is "deeply rooted in our jurisprudence," with its foundations in our history and in "[e]lementary considerations of fairness," a presumption against retroactive legislation. *Id.* at 265, 114 S.Ct. at 1497. Consequently, if application of the amended statute would have such a retroactive effect, "then we presume it will not apply to ... conduct ... which occurred prior to its effective date" absent a clear congressional directive to do so. *Hughes,* —— U.S. at ——, 117 S.Ct. at 1876; *see also United States v. Certain Funds,* 96 F.3d 20, 24 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 954, 136 L.Ed.2d 841 (1997).

In amending § 2707(a), Congress did not provide any explicit direction regarding the application of the amendment to cases pending at the time of its passage. Consequently, we must determine if its application in the instant case would have a retroactive effect as elucidated in *Hughes* and *Landgraf.*

In *Landgraf,* the Court held that sections of the Civil Rights Act of 1991, creating a right to recover compensatory and punitive damages for certain violations of Title VII of the Civil Rights Act of 1964 and providing for jury trial where such damages are sought, did not apply to a case that was pending on appeal when the statute was enacted. 511 U.S. at 247, 114 S.Ct. at 1487. Although the amendment did "not make unlawful conduct that was lawful when it occurred," *id.* at 281–82, 114 S.Ct. at 1506 it did increase the potential monetary liability of defendants, and its application to cases pending on appeal would have significantly increased defendants' potential liability for events antedating the enactment of the amendment. Consequently, the Court held, the amendment could not be applied retroactively absent a clear manifestation of congressional intent to do so. *Id.* at 282–83, 114 S.Ct. at 1506–07; *see also Rivers v. Roadway Express, Inc.,*

511 U.S. 298, 303, 114 S.Ct. 1510, 1515, 128 L.Ed.2d 274 (1994) (holding increase in monetary liability could not be applied retroactively even though the "normative scope of Title VII's prohibition on workplace discrimination" was unchanged).

Similarly, in *Hughes,* the Court addressed a 1986 amendment to the False Claims Act ("FCA") that eliminated an affirmative defense previously available to FCA defendants in actions brought by so-called "private attorneys general," or *qui tam* plaintiffs. The case involved events that took place prior to the amendment, and the issue before the Court was whether Hughes could still invoke the affirmative defense, thereby blocking the *qui tam* action, or whether the amendment applied to pending cases. The Court rejected the analysis of the Court of Appeals for the Ninth Circuit, which had concluded that because the amendment was "jurisdictional" in character it could be applied as an "exception" to the general presumption against retroactive application; *see Hughes,* ––– U.S. at –––, 117 S.Ct. at 1878. In rejecting the circuit court's approach, the Court applied a functional analysis, stressing that statutory provisions that may properly be denominated "jurisdictional," but that alter the substantive rights of parties, cannot be applied retroactively absent a clear statement of congressional intent to do so. "In permitting actions by an expanded universe of plaintiffs with different incentives, the ... amendment essentially creates a new cause of action...." *Id.* "This is true even if a cause of action remained open to some other party [prior to the amendment]. It is simply not the case that ... the elimination of a prior defense to *qui tam* actions does not create a new cause of action or change the substance of the extant cause of action." *Id.* (internal quotation marks omitted).

The Court in *Hughes* distinguished between amendments that expose a defendant to "an expanded universe of plaintiffs" and statutory changes that "affect only *where* a suit may be brought, not *whether* it may be brought at all." *Id.* The Court found that the amendment to the FCA "does not merely allocate jurisdiction among fora. Rather, it *creates* jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well. Such a statute, even though phrased in 'jurisdictional' terms, is as much subject to our presumption against retroactivity as any other." *Id.*

It is clear that application of the amended ECPA to the instant case would subject defendants to increased liability for acts that antedate the effective date of the amendment. By broadly affording standing to "other person[s] aggrieved," and not merely "customer[s]," the 1996 amendment to the ECPA "permit[s] actions by an expanded universe of plaintiffs with different incentives" and "creates jurisdiction where none previously existed." *Id.* Accordingly, we hold that the amendment cannot be applied to cases pending at the time of its enactment. Thus, if plaintiffs have standing to bring suit under Title II of the ECPA, it must be because they qualify as "customer[s]" for purposes of § 2707(a) of the Act as it existed at the time this action was brought. We turn, then, to a consideration of the meaning of the term "customer" as used in the Act.

### III.

■ We review the district court's grant of summary judgment *de novo. Madonna v. American Airlines, Inc.,* 82 F.3d 59, 61 (2d Cir.1996). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997). The question we address is whether defendants are entitled to summary judgment because as a matter of law plaintiffs are not "customer[s]" of Fedwire and therefore do not have standing to bring this suit.

Plaintiffs argue on appeal that the relevant electronic communication service comprises not just the Federal Reserve Banks' fund transfer mechanism—Fedwire—but the "intermediary banks" such as the sending and receiving banks in Texas and New York, and

even plaintiffs' banks in Colombia.[4] Plaintiffs argue that because they are customers of the Colombian banks, they are, therefore, by extension, customers of the Fedwire electronic communications service and hence are "customer[s]" for purposes of the ECPA.

Title II of the ECPA provides that whoever

(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or

(2) intentionally exceeds an authorization to access that facility;

and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished. . . .

18 U.S.C. § 2701(a). The ECPA was enacted to "protect against the unauthorized interception of electronic communications." S. REP. No. 99–541, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3555 ("Senate Report"). The ECPA does provide for governmental access under certain specified conditions. *See* 18 U.S.C. §§ 2703–06 (establishing procedures under which governmental entities may obtain warrants to secure access to electronic information and non-governmental entities may oppose and obtain compensation for such access) and 18 U.S.C. § 2709 (detailing specific access rules for government counterintelligence). Prior to the 1996 amendment, Title II of the ECPA provided a private right of action such that

any provider of electronic communication service, subscriber, or *customer* aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity which engaged in that violation such relief as may be appropriate.

18 U.S.C. § 2707(a) (emphasis added).[5] However, because "customer" is not defined in the ECPA, *see* 18 U.S.C. §§ 2510, 2711 (definition sections of ECPA), we must look elsewhere to determine whether plaintiffs are customers for purposes of the Act.

## A. *The Language of the Statute*

Although the ECPA does not define "customer," the language of the statute suggests that Congress did not intend § 2707(a) to have such broad effect as to afford plaintiffs a cause of action under the facts in this case. That other provisions of the Act broadly grant a private right of action to "any person aggrieved" strongly suggests that Congress intended § 2707(a) to cover a more limited class of plaintiffs. *See* 18 U.S.C. § 2710(c) (creating civil cause of action for "[a]ny person aggrieved" by violations of the ECPA's video tape disclosure rules); 18 U.S.C. § 2520(a) (establishing right of recovery for "any person" whose electronic communication is intercepted in violation of the ECPA); 18 U.S.C. § 2518(10)(a) (making a motion to suppress intercepted information available to "[a]ny aggrieved person"). We believe that if Congress in 1986 had intended to allow *any person* the right to sue under 18 U.S.C. § 2707(a), it could and would have plainly said so, as it did in other sections of the ECPA, and, indeed, as it ultimately did in the 1996 amendment. *Cf. Bennett v. Spear,* —— U.S. ——, ——, 117 S.Ct. 1154, 1162, 137 L.Ed.2d 281 (1997) (contrasting, as interpretive aid, the breadth of statutory language providing that "*any* person may commence a civil suit" with the narrower "language Congress ordinarily uses") (emphasis added).

Furthermore, the ECPA is precise in its use of terms identifying the specific participants in an electronic communication, with whom particular provisions are concerned. The Act variously addresses "originator[s]," "addressee[s] or intended recipient[s]," and "parties" to electronic communications. *See,*

---

**4.** Neither of plaintiffs' Colombian banks had an account at a Federal Reserve Bank, and therefore they could not directly originate or receive funds over Fedwire.

**5.** Title I of the ECPA also provides for a cause of action where electronic communications are "in-

tercepted," *see* 18 U.S.C. § 2520. However, in *Daccarett,* 6 F.3d at 54, we held that the communications at issue here had not been "intercepted" because no "device" was used. Accordingly, the only potential remedy for plaintiffs is under § 2707(a).

*e.g.,* 18 U.S.C. § 2511(3)(a) (prohibiting disclosure of the contents of an electronic communication to "any person or entity other than an addressee or intended recipient of such communication"); 18 U.S.C. § 2702(b)(1) (allowing disclosure of information to "addressee or intended recipient of such communication or an agent of such addressee or intended recipient"); 18 U.S.C. § 2702(b)(3) (allowing disclosure of information from electronic communication with the consent of "originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service"); 18 U.S.C. § 2511(2)(c) (providing that "[i]t shall not be unlawful ... for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.").

Plaintiffs' argument would, in essence, have us interpret "customer" to mean "any person." The ECPA, however, expressly uses the word "person"—rather than "customer"—where it indicates an individual with merely an interest in the communication. *See, e.g.,* 18 U.S.C. § 2510(2) (" 'oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception...."); 18 U.S.C. § 2518(1)(b)(iv) (applications for authorization to intercept an electronic communication must include the "identity of the person, if known, committing the offense and whose communications are to be intercepted"); 18 U.S.C. § 2518(4) (upon request of applicant, an order authorizing interception should direct providers of electronic communication services to accomplish interception with minimum interference to "services that [they are] according the person whose communications are to be intercepted"); 18 U.S.C. § 2705(b) (when the intercepting government agency "is not required to notify the subscriber or customer [of the disclosure of the contents of the electronic communication] ... [it] may apply to a court for an order commanding a provider of electronic communications service ... not to notify any other person of the existence of the ... court order."); 18 U.S.C.

§ 2709(b)(2)(B)(i) (referring to the ultimate beneficiaries of electronic communications as "individual[s]," not as "customer[s]," in a provision authorizing the Federal Bureau of Investigation to request the name and address of an "individual" suspected of engaging in terrorism who used the electronic communication service.) The ECPA, therefore, clearly distinguishes between "customers" and mere "persons" or "individuals" with other types of interests in electronic communications. The language used throughout the ECPA suggests that "customer" must be defined narrowly to give effect to this distinction.

B. *Legislative History*

This reading of the statutory language is bolstered by a review of the legislative history. An examination of the Senate Judiciary Committee Report recommending passage of the ECPA supports the conclusion that Congress did not intend the 1986 Act to provide the broad standing to sue the Government that plaintiffs assert. *See* Senate Report at 3555. While Congress acted to protect the privacy of electronic communications, the Senate Report indicates that Congress intended to strike "a fair balance between the privacy expectations of American citizens and the legitimate needs of law enforcement agencies." *Id.* at 3559.

In seeking to strike this balance, Congress modeled Title II of the ECPA after the RFPA. *See* Senate Report at 3557. It is therefore instructive to determine how the RFPA treats the concept of "customer;" particularly where, as here, the electronic communication service at issue is a financial service, with which the RFPA is primarily concerned. *Cf. Tucker v. Waddell,* 83 F.3d 688, 692 (4th Cir.1996) (examining the RFPA in order to determine the contours of the ECPA). The RFPA defines "customer" narrowly, restricting its use to "any person or authorized representative of that person who utilized or is utilizing any service of a financial institution, or for whom a financial institution is acting or has acted as a fiduciary, in relation to an account maintained in the person's name." 12 U.S.C. § 3401(5). This Court has already explicitly held that

plaintiffs in the instant case are not "customers" for purposes of the RFPA, because they did not hold accounts in their own names at the institutions from which the funds were seized, namely, the intermediary banks. *See Daccarett,* 6 F.3d at 51–52. This restrictive reading of the RFPA strongly suggests that the term "customer" should likewise be construed narrowly for purposes of the ECPA.

Plaintiffs are Colombian corporations that were the intended recipients of wire transfers originating in the United States. The wire transfers at issue were those between U.S. Federal Reserve Banks, in transit along the "Fedwire" electronic communication service. Plaintiffs concededly do not maintain accounts at the Federal Reserve Banks, nor were the funds seized as they moved from any accounts maintained by plaintiffs at the U.S. intermediary banks. Title II of the ECPA, 18 U.S.C. § 2707(a), however, does not afford standing to "intended beneficiaries" of wire transfers. Accordingly, in light of the language of the ECPA, its legislative history, and the guidance offered by the RFPA, we conclude that plaintiffs in the instant case are not "customer[s]" of Fedwire and therefore that they lack standing to bring this suit.

We have considered plaintiffs' other claims on appeal, and we find them to be equally without merit.

## IV.

To summarize:

1. The 1996 amendment to 18 U.S.C. § 2707(a), providing a civil cause of action for certain violations of the ECPA to "any provider of electronic communication service, subscriber, or other person aggrieved," acts to "create[ ] jurisdiction where none previously existed" and permits actions "by an expanded universe of plaintiffs with different incentives," and therefore does not apply to actions pending at the time of its enactment, including this action.

2. The pre-existing version of § 2707(a) provided a civil cause of action for violations of the ECPA to "any provider of electronic

communication service, subscriber, or customer."

3. The text and legislative history of the ECPA, as well as our construction of the RFPA, compel a narrow construction of the term "customer" in the ECPA.

4. Plaintiffs were not "customer[s]" of Fedwire, and therefore lack standing to bring this action.

Accordingly, the judgment of the district court is affirmed.