UNITED STATES of America,
Plaintiff,

v.

630 ARDMORE DRIVE, CITY OF DUR-HAM, PARKWOOD TOWNSHIP, DURHAM COUNTY, NORTH CAR-OLINA, with all appurtenances and improvement thereon, et al., Defendants.

No. 1:01CV204.

United States District Court,
M.D. North Carolina.

Nov. 1, 2001.

Gill P. Beck, Office of the U.S. Atty., Greensboro, NC, Lynne P. Klauer, Office of U.S. Atty., Greensboro, NC, for Plaintiff.

Thomas F. Loflin, III, Loflin & Loflin, Durham, NC, David Thomas Lambeth, Jr., Burlington, NC, for claimant.

Labonne A. HUnter, Durham, NC, pro se.

## MEMORANDUM OPINION

BEATY, District Judge.

This civil forfeiture action against ten parcels of real estate ("Defendants" or "Properties"), brought by Plaintiff United States Government ("Plaintiff" or "Government"), is presently before the Court on the motions of two claimants, LaBonne Hunter and LaTeasha Hunter ("Claimants"). Claimants assert that they own, as tenants-in-common, one of the Defendants—630 Ardmore Drive, City of Durham, Parkwood Township, Durham County, North Carolina ("Ardmore property"). Claimant LaBonne Hunter submitted a motion to dismiss the Ardmore property due to insufficiency of process and/or insufficiency of service of process and failure to state a claim [Document # 18]. Claimant LaTeasha Hunter then filed a motion to dismiss the Ardmore property for failure to state a claim [Document # 35].

For the reasons that follow, Claimant LaBonne Hunter's motion to dismiss the Ardmore property for insufficiency of process, insufficiency of service of process, and failure to state a claim is DENIED. Claimant LaTeasha Hunter's motion to dismiss the Ardmore property for failure to state a claim is also DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On February 23, 2001, the United States Government began civil forfeiture proceedings against the multiple real estate holdings of Maurice Harris ("Harris"). Shortly before the Government began these proceedings, Maurice Harris died from a gunshot wound. His body was found on January 13, 2001, at a construction site not far from the residential lot at issue in this motion, the Ardmore property. In addition to the Ardmore property, Defendants for this forfeiture action are the following nine Durham, North Carolina parcels, including their appurtenances and improvements, that were allegedly owned by Harris: 702 Carroll Street, 1117 Eva Street, 112 South Hyde Park Avenue, 819 Lee Street, 510 Oakwood Avenue, 910 Spruce Street, 1915 Taylor Street, 320 East Umstead Street, and 314 Wake Place. All of these Properties are titled in Harris's name except the Ardmore property, which is titled in Claimants' names. None of the Properties have any outstanding recorded deeds of trust.

Although Harris's multiple property holdings might square with his statements on two credit applications that he was in the real estate business, the Government contends that Harris actually earned his income illegally, by directing a drug organization that "is responsible for the distribution of an estimated five kilograms of cocaine per month in the Durham, North

Carolina area." (Pl.'s Compl., Gov.Ex. A, at 2.) According to the Government's investigation, Harris orchestrated his drug business with the help of at least six other people: Johnnie Taylor, Randy Brooks, Kirk Riggins, Maurice Harris's brothers Tyree Harris, Sr. and Melvin Harris, and his father, Jesse Harris. *Id.* at 2–6. To connect these other individuals to the drug operation, the Government monitored a confidential source who engaged in seven purchases of cocaine base, commonly known as crack cocaine, from these six different persons. *Id.* Corroborating this evidence, two other confidential sources confirmed that they also had purchased cocaine from members of Harris's drug operation. Further connecting the drug organization to Maurice Harris, all three sources witnessed, between 1998 and 2000, dozens of occasions when Maurice Harris would restock Melvin Harris's or Jesse Harris's drug supply with additional cocaine. *Id.* at 8–11, 13. In addition, one source indicated that he observed Maurice Harris weighing marijuana and heard Maurice Harris discussing when he would get his next shipment. *Id.* at 10. This same source also agreed to allow law enforcement to record a meeting between Maurice Harris and the informant where they discussed a sale of crack cocaine, although the transaction itself never occurred. *Id.* at 6. Although most of these incidents occurred during the Government's investigation, between 1998 and 2000, one of the confidential sources had participated in "a drug relationship" with Melvin Harris, a member of this drug operation, since 1990. *Id.* at 12–13.

Furthermore, the informants directly observed illegal activity at three of the Properties. Specifically, confidential sources observed frequent drug trafficking activities at Maurice Harris's property located at 112 South Hyde Park Avenue. At this location, they viewed cocaine being purchased, weighed, bagged, and cooked into crack cocaine, *Id.* at 2, 3, 8–12. Another property, 1117 Eva Street, was similarly used, in that one informant revealed that he transported cocaine to and from the residence at 1117 Eva Street to other locations. *Id.* at 8–10. At the third property, 314 Wake Place, an informant indicated that he watched as Melvin Harris retrieved cocaine from inside the residence. *Id.* at 11.

With respect to the Ardmore property, the Government has alleged that a connection can be drawn between the Ardmore property and the proceeds from illegal cocaine trafficking based upon Maurice Harris's income and spending habits. For example, on two credit applications, Maurice Harris stated that he had worked as a Durham realtor for the past seven years and specifically for his own business, Harris Realtors, for the past four and one-half years. *Id.* at 18–19. However, there is no indication that Harris had the real estate license or a business license required to conduct such business. *Id.* at 20. Harris, allegedly acting as a Realtor, purchased all ten of the Properties within a seven-year time period, between 1993 and 2000.[1] Additionally, the Government indicates that it has reason to believe that proceeds from the drug operation were used to fund improvements to some of these Properties,

---

1. The purchase prices and dates for the Properties are as follows: 630 Ardmore Drive, $26,000.00, 7/19/1993; 819 Lee Street, $4,000.00, 11/28/1994; 1915 Taylor Street, purchase price unknown, 5/11/1995; 510 Oakwood Avenue, $1,000.00, 9/15/1995; 314 Wake Place, $5,000.00, 11/15/1995; 112 South Hyde Park Avenue, purchase price unknown, 2/25/1998; 910 Spruce Street, $33,000.00, 12/8/1998; 1117 Eva Street, $40,000.00, 1/14/1999; 702 Carroll Street, $6,500.00, 2/16/1999; 320 East Umstead Street, $26,000.00, 3/13/2000. *Id.* at 13–21.

including the Ardmore property. While the assessed property value for half of the Properties apparently remained constant or decreased, property values for five of the Properties have more than doubled since they were initially purchased. In fact, the Ardmore property itself is now valued for tax purposes at $83,880.00, which is more than three times its 1993 purchase price of $26,000.00. *Id.* at 13–17.

Of all the Properties that the Government claims a right to, the Ardmore property presents somewhat of a different picture. First, unlike the other nine Properties, the Ardmore property is not titled in Maurice Harris's name. Instead, the Ardmore property is titled to Claimants, LaBonne Hunter and LaTeasha Hunter, who assert that they purchased it on July 19, 1993, for $26,000.00. In fact, Claimants assert that the money for the Ardmore property came from a Social Security Administration entitlement attributed to LaTeasha Hunter. Also, as Claimants would contend, unlike several of the other Properties, the Government has not alleged any specific sightings of drugs or drug transactions involving the Ardmore property.

Nevertheless, there is evidence here that connects Harris to the Ardmore property. The evidence also suggests that the Ardmore property was Harris's primary residence. For instance, Harris was often seen coming to and from the Ardmore property. Even after his death, Harris's family members informed the police that the Ardmore address was his home. *Id.* at 18–20. In addition, a vehicle that Maurice Harris had purchased, a 2000 GMC Yukon sports utility vehicle, was often parked in front of the house. *Id.* It is also significant that Maurice Harris represented on

multiple documents that he currently resided at the Ardmore property. For example, on the loan application for the Yukon vehicle, Maurice Harris stated that he had lived at the Ardmore property since September of 1992—ten months before the Claimants allegedly purchased the Ardmore property on July 19, 1993. *Id.* at 13, 17–18. Additionally, Maurice Harris listed the Ardmore property as either his personal residence or his return mailing address on the deeds for all nine of the other Properties. (Pl.'s Compl., Gov.Ex. A–2 – A–10.) Not only does the Government present these allegations suggesting a connection between Harris and the Ardmore property, the Government's evidence also suggests a relationship between Harris and LaBonne Hunter. In fact, she is the mother of Maurice Harris's son, Maurice Marcell Harris, Jr., who was born September 30, 1987. In addition, the police routinely observed LaBonne Hunter driving Maurice Harris's 2000 GMC Yukon.[2]

Based on this information, the Government filed a Verified Complaint of Forfeiture [Document # 1] against all ten Properties. On May 23, 2001, LaBonne Hunter asserted an interest in the Ardmore property by filing a Notice of Claim [Document # 19] and a Motion to Dismiss the Ardmore property [Document # 18], based on the Government's allegedly improper service and its failure to state a claim. LaTeasha Hunter joined this suit on June 27, 2001, when she also filed a notice of claim as to the Ardmore property [Document # 32]. Shortly thereafter, LaTeasha Hunter also requested dismissal as to the Ardmore property due to the Government's failure to state a claim [Document # 35].

---

2. Maurice Harris, Jr., has recently joined these proceedings, in that his mother, LaBonne Hunter, has filed, on his behalf as a minor and an heir of Maurice Harris, a notice of claim to the other nine Properties [Document # 38].

## II. DISCUSSION

### A. Claimant LaBonne Hunter's Rule 12(b)(4) and 12(b)(5) Motions

As an initial matter, LaBonne Hunter requests dismissal of the Ardmore property for insufficiency of process and insufficiency of service of process pursuant to Rules 12(b)(4) and (b)(5) of the Federal Rules of Civil Procedure ("Rules"). LaBonne Hunter argues that the statutes which authorize this type of civil forfeiture, 21 U.S.C. § 881 and 18 U.S.C. § 981, require a different type of notice than the steps taken by the Government in this case. Specifically, LaBonne Hunter asserts that the Government should have obtained a summons and a warrant for the arrest of the Ardmore property in order to properly join it as a defendant. (Claimant LaBonne Hunter's Mot. to Dismiss Def. 630 Ardmore Drive at 4–5.) The Government does not deny that it did not obtain these documents. Instead, the Government posted a copy of the verified complaint on the property and mailed another copy of the verified complaint to the Claimants by way of certified mail.[3] LaBonne Hunter argues that the Government's failure to obtain a summons and a warrant for arrest violates constitutional due process and statutory procedural requirements, and requests, as a remedy, the dismissal of the Ardmore property from the suit.[4]

In support of her contention, LaBonne Hunter argues that, because the Government did not obtain a warrant for arrest in rem and a summons, her Due Process rights under the Fifth Amendment were violated. She contends that without these documents, she was not aware of the deadlines for any responsive pleading she would have been obligated to file in this case and therefore she did not receive "adequate notice" of the proceedings. *Id.* at 5. In a general sense, LaBonne Hunter correctly argues that the Fifth Amendment of the Constitution prevents the deprivation of "life, liberty, or property without due process of law." U.S. Const.amend. V. Indeed, the forfeiture of the Ardmore property, if the Government were to succeed in its efforts, would be a deprivation of property that can only be done in accordance with due process. Nevertheless, procedural due process is different from the procedures and process required by statute or by the Rules. Procedural due process is not an arduous requirement; it simply requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865, 873 (1950). Here, these requirements were satisfied, despite the deficiencies in the Government's attempts at service as Claimant LaBonne Hunter has alleged. In this case, LaBonne Hunter received notification from the Government of its

---

**3.** Claimants did not receive this notice at the same time. According to the certified mail receipt presented by the Government, LaBonne Hunter received a copy of the complaint and a notice of lis pendens on May 3, 2001. Two months later, on July 2, 2001, LaTeasha Hunter received the same information.

**4.** Although LaBonne Hunter shares an interest in the Ardmore property with her daughter LaTeasha Hunter as tenants-in-common, only LaBonne Hunter challenges the Government on these grounds, requesting dismissal as to the entire property. Based on the Court's resolution of the Rule 12(b)(4) and 12(b)(5) motions, it is not necessary to determine whether a tenant-in-common has standing to challenge the civil forfeiture of the entire property.

claims to the Ardmore property before any deprivation might occur. In fact, LaBonne Hunter's present ability to bring this matter to the Court's attention demonstrates that she currently enjoys an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66 (1965)). The Court, therefore, finds that Claimant LaBonne Hunter has, in this instance, received proper procedural protection as required by the Fifth Amendment of the Constitution.

Although LaBonne Hunter's request for dismissal of the Ardmore property based on Constitutional due process violations must fail, LaBonne Hunter still argues that the notice was improper under applicable statutes, an error she contends would require dismissal of the forfeiture proceeding against the Ardmore property. Specifically, she argues that under the procedural framework established by the statutes authorizing forfeiture in this case, the Government is required to obtain a summons and a warrant for the arrest of the real property. In light of the fact that the Government did not obtain these documents, LaBonne Hunter contends that dismissal of the Ardmore property from these proceedings is the proper remedy. (LaBonne Hunter's Mot. to Dismiss Def. 630 Ardmore Drive at 4.)

In order to determine what the procedural statutory requirements are for this type of proceeding, the Court must be guided by the statutes that authorize civil forfeiture. The Government claims a right to the Properties under three statutory provisions, two of which are found in the Comprehensive Drug Abuse Prevention and Control Act ("Act"). Under the Act, the Government may initiate forfeiture proceedings against real property that "is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of" certain drug-related felonies. 21 U.S.C. § 881(a)(7). The Act also allows the Government to seek civil forfeiture with respect to all "proceeds", including real estate purchased with proceeds, from certain illegal drug activities. 21 U.S.C. § 881(a)(6); *United States v. Fed. Nat'l Mortgage Ass'n*, 946 F.2d 264, 265 (4th Cir.1991) (defining proceeds to include "real property which was purchased with proceeds traceable to drug transactions"). The third forfeiture provision that applies in this instance allows the Government to claim the gains from any transaction designed to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds" earned through illegal activities such as the unlawful manufacture, sale or distribution of controlled substances. 18 U.S.C. §§ 981, 1956(a)(1)(B)(i), (c).

In order to initiate a forfeiture proceeding under any of these three provisions, the Government must comply with specific procedural requirements. Until recently, forfeiture proceedings of the types covered by the three provisions described here were required to be conducted according to the procedural requirements established under customs law. 21 U.S.C. § 881(d), 18 U.S.C. § 981(d). Customs law, in turn, applies the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rules") and, to the extent they do not conflict with the Supplemental Rules, the Federal Rules of Civil Procedure. Fed.R.Civ.P. Supplemental Rule A. As LaBonne Hunter asserts, these Supplemental Rules required that the Government obtain both a summons and a warrant for arrest in rem to properly begin a forfeiture proceeding. Fed.R.Civ.P. Supplemental Rule C(3). However, this requirement changed in 2000, when Con-

gress enacted the Civil Asset Forfeiture Reform Act ("CAFRA"). CAFRA provides for a specific procedure in all forfeiture proceedings involving real property that overrides the more general requirements of the Supplemental Rules. 18 U.S.C. § 985(a). Under the new CAFRA provisions, the Government is not required to procure the summons and warrant for arrest in rem specified in the Supplemental Rules. Instead, the Government must serve the property owner with a notice of the complaint along with a copy of the complaint itself. In addition, the Government must post a notice of the complaint on the property. 18 U.S.C. § 985(c). If the Government complies with this aspect of CAFRA, "it shall not be necessary for the court to issue an arrest warrant in rem, or to take any other action to establish in rem jurisdiction over the property." *Id.* § 985(c)(3).

Therefore, if the Government had exactly followed CAFRA's requirements as they relate to the Ardmore property, then LaBonne Hunter's assertion that the Government would also need to serve her with a summons and a warrant for arrest in rem would be clearly incorrect. However, the Government did not properly comply with 18 U.S.C. § 985(c), to the extent that it did not create and distribute the "notice of the complaint" that CAFRA requires to be posted on the property and which "notice" must also accompany a copy of the complaint served on the property owner. *Id.*

Although LaBonne Hunter cannot insist that the Government procure a warrant for arrest in rem and a summons, she still has a colorable argument for dismissal due to insufficiencies of process because the Government only served her with a copy of the complaint itself, and not with a notice of a complaint, as required by CAFRA. Any harm that LaBonne Hunter suffered by not receiving the notice of the com-

plaint would depend in part on what information this notice of complaint would have otherwise provided to her. Although CAFRA does not specify what the notice of the complaint should include, the Government concedes that the notice should, at a minimum, inform the recipient "of the time limits on and requirements for filing a claim in the action." (Pl.'s Resp. to Claimant LaBonne Hunter's Mot. to Dismiss Def. 630 Ardmore Drive.) To the extent that the Court agrees with this position, the inquiry becomes whether the Government's failure to provide LaBonne Hunter with a notice that included the time limits and deadlines for filing a claim in this action would justify a ruling in LaBonne Hunter's favor on her motion to dismiss. The rationale of other cases addressing Rule 12(b)(4) and (12)(b)(5) issues is instructive, even though most of these cases involve violations of Rule 4, which governs the form and methods of service of process for most civil cases. Fed.R.Civ.P. 4, 12. Courts generally treat Rule 4 as "a flexible rule that should be liberally construed so long as a party receives sufficient notice of the complaint." *Benny v. Pipes,* 799 F.2d 489, 492 (9th Cir.1986), *cert. denied,* 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987); *see also Kitchens v. Bryan County Nat. Bank,* 825 F.2d 248, 256 (10th Cir. 1987). As a result, a "technical violation of the rule or failure of strict compliance may not invalidate the service of process." *Armco, Inc. v. Penrod–Stauffer Bldg. Sys., Inc.,* 733 F.2d 1087, 1089 (4th Cir.1984). However, the Fourth Circuit has required strict compliance when a party avoids the "plain requirements" of the rule, particularly if the improper notice confuses or otherwise inconveniences the plaintiff. *Id.* (holding that, in contrast to the usual liberal reading of Rule 4, the procedure to request that the defendant waive service, as explained under the predecessor of Rule 4(d), should be followed precisely).

■ After reviewing the CAFRA provisions, the Court determines that the provisions governing notice for real property should receive, like most of Rule 4, a "liberal construction." *Id.* As previously stated, the Rules of Civil Procedure still apply to civil forfeiture proceedings, except when they conflict with the provisions of the forfeiture statute or the Supplemental Rules. Here, neither CAFRA nor the Supplemental Rules address the consequences of improper notice or direct that the notice requirements of 18 U.S.C. § 985 be enforced more strictly than the notice requirements of Rule 4. The Court deems it appropriate that the Court's consideration of a Rule 12(b)(4) or 12(b)(5) motion in a forfeiture proceeding should follow the same analysis as stated above. For these reasons, the Court will apply the general policy under Rule 4 to the Government's failure in this instance to mail a "notice of the complaint" to Claimant LaBonne Hunter. Therefore, the Court finds that it will only be appropriate to grant Claimant's Rule 12(b)(4) and 12(b)(5) motion if she, as the moving party, has suffered prejudice from not receiving a notice of the complaint. *See, e.g., Gottfried v. Frankel,* 818 F.2d 485, 492–93 (6th Cir.1987) (holding that, in an NLRB proceeding, case should not be dismissed because plaintiff did not serve defendant with a summons, as required by Rule 4).

■ With respect to the issue of prejudice, given the current procedural status of this matter, it is clear that LaBonne Hunter received actual notice of the proceeding based upon her receipt of a copy of the complaint itself, which provided sufficient details about the subject of the dispute. Even without receiving a notice of the complaint providing the deadlines for filing responsive pleadings, LaBonne Hunter timely and properly submitted her responsive pleading. Furthermore, LaBonne Hunter has not alleged how in any way the lack of receipt of a notice of the complaint interfered with her ability to properly assert her claim against the Government's forfeiture proceeding. Again, considering the information LaBonne Hunter received from the copy of the complaint itself and the absence of a showing of prejudice relating to not also receiving a notice of the complaint, the Court declines to dismiss the Government's case on these grounds. For these reasons, Claimant LaBonne Hunter's Motion to Dismiss is DENIED to the extent that it is based upon Claimant's allegations of insufficient process and/or insufficient service of process pursuant to Rules 12(b)(4) and 12(b)(5) of the Federal Rules of Civil Procedure.

B. Claimants' Rule 12(b)(6) Motions

Both Claimants, LaBonne Hunter and LaTeasha Hunter, also move to dismiss the Government's civil forfeiture complaint pursuant to Rule 12(b)(6) for failure to state a claim. The usual starting point for an analysis of a motion to dismiss pursuant to Rule 12(b)(6) involves the Court "accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir.1999). As a result, the Court therefore may only grant dismissal when it is "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957). The Government in this matter has generally alleged within its Complaint for forfeiture that the Ardmore property was either purchased with proceeds from illegal activities or it was used in the facilitation of a drug-related crime. Nothing else appearing, the Court would apply the normal 12(b)(6) standard in considering the Government's

claim of civil forfeiture based upon three separate forfeiture provisions which include 21 U.S.C. § 881(a)(7), 21 U.S.C. § 881(a)(6), and 18 U.S.C. § 981, as they each relate to the Ardmore property. The normal consideration, however, is complicated by the need in this instance for the Court to consider what interaction must take place between an analysis of Rule 12(b)(6), the new "preponderance of the evidence" standard under CAFRA as set out in 18 U.S.C. § 983(c), the CAFRA rule set out in 18 U.S.C. § 983(a)(3)(D), which appears to address the standard courts should consider for dismissals pursuant to Rule 12(b)(6), and finally, Supplemental Rule E(3), as they all relate to civil forfeiture proceedings. It is worth noting that as of this time no other federal court has addressed the effect of CAFRA on civil forfeiture proceedings since the statute itself indicates that it did not take effect until 120 days after April 25, 2000. 18 U.S.C. § 983, stat. note.

At the very least, it appears that CAFRA's burden of proof scheme as set out in Section 983(c) of CAFRA is new. Before the enactment of CAFRA, the civil forfeiture statutes incorporated the procedural requirements developed under customs law. Under the customs law, the Government could succeed in forfeiture proceedings by demonstrating *probable cause* that the property was connected with illegal drug activity. 19 U.S.C. § 1615. However, presently under CAFRA, the Government must meet a higher level of proof in order to prevail in a civil forfeiture proceeding in that it must establish by a "preponderance of the evidence" that the "property is subject to forfeiture." 18 U.S.C. § 983(c). Once the Government has met this burden, a claimant must demonstrate by a preponderance of the evidence that he or she was an innocent owner of the property or rely upon some other affirmative defense. 18 U.S.C. § 983(d).

■ While 18 U.S.C. § 983(c) of CAFRA raises the burden of proof for the Government in a civil forfeiture proceeding, there appears to be a relaxation of the proof that the Government is required to demonstrate in response to a 12(b)(6) motion made at an earlier stage of a forfeiture proceeding. Generally, for the non-moving party, a 12(b)(6) motion to dismiss does not present an insurmountable bar to the extent that the movant in order to prevail has to establish that there are no set of facts pled in the non-movant's claim that would allow relief. In essence, a non-movant can defend by showing that his or her complaint can and has set forth a set of facts that would allow relief as to the claim asserted. However, CAFRA now appears to require even less as a defense to a 12(b)(6) motion to dismiss to the extent that the statute provides that "no complaint may be dismissed on the ground that the Government did not have *adequate evidence* at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D) (emphasis added).[5] Adequate evidence, as

---

5. At first glance, it appears unclear whether the CAFRA provision that establishes this evidentiary standard, 18 U.S.C. § 983(a)(3)(D), even applies to this proceeding. Section 983(a) has the heading "general rules for civil forfeiture proceedings", but it then addresses two different kinds of proceedings—judicial forfeiture proceedings, such as the one currently before the Court, and administrative forfeiture proceedings, where the Government's right to the property is first placed before an agency decision-maker. Although 18 U.S.C. § 983(a) does not always clearly mark which of its subsections apply to each type of proceeding, the evidentiary standard unambiguously states "no complaint." 18 U.S.C. § 983(a)(3)(D). For these reasons, the Court determines that 18 U.S.C. § 983(a)(3)(D) can appropriately apply to judicial forfeiture proceedings.

referred to in the statute, is not defined, but based upon a plain reading of the statute, it would appear that the Government's forfeiture claim can advance forward in face of a 12(b)(6) motion to dismiss even if the Government's Complaint does not provide all the facts that would allow the Government to ultimately succeed in the forfeiture proceeding.

Claimant LaBonne Hunter, however, argues for a different reading of the reference in CAFRA to "adequate evidence." According to Claimant's interpretation, the adequate evidence provision should only apply when testing the sufficiency of the Government's forfeiture claim at the time the Government's Complaint is filed. Claimant further suggests that the "adequate evidence" standard would not apply at what she would refer to as a later "pleading stage," such as when a subsequent motion to dismiss has been filed. (Claimant LaBonne Hunter's Brief in Reply to Pl.'s Resp. to Claimant's Mot. to Dismiss at 3.) Under Claimant's interpretation, it would be difficult to determine when and if 18 U.S.C. § 983(a)(3)(D) would ever apply. Reading the standard set out in 18 U.S.C. § 983(a)(3)(D) in conjunction with the normal standard applied in considering a 12(b)(6) motion to dismiss can only lead one to the conclusion that CAFRA expresses Congress's intention to relax the 12(b)(6) standard of review, albeit only in civil forfeiture proceedings.[6]

As the Court noted initially, the effect of CAFRA is also considered in conjunction with other rules of pleading that apply to civil forfeiture proceedings. Notwithstanding the Court's previous analysis of the standards of proof required for testing the sufficiency of the Government's forfeiture claim, Claimants would suggest that CAFRA's effect is to be reviewed in particular as to how it squares with Supplemental Rule E(2)(a) which requires more particularity in a complaint for a forfeiture than the notice pleading generally accepted by federal courts. Pursuant to Supplemental Rule E(2)(a), the Government in a forfeiture proceeding must "state the circumstances from which the claim arises with such particularity" to allow the claimants to "commence an investigation of the facts and to frame a responsive pleading." This provision is designed to let the claimant "respond without further procedural maneuvering" by saving him the inconvenience of filing a motion for a more definite statement. *U.S. v. $39,000 in Canadian Currency*, 801 F.2d 1210, 1217 (10th Cir.1986). Several appellate courts have determined that Supplemental Rule E does not require the Government to meet its ultimate trial burden in its complaint; it simply must "establish a 'reasonable belief'" that the Government can demonstrate its burden of proof at trial. *United States v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993) (quoting *United States v. U.S. Currency, in the Amount of $150,660.00*, 980 F.2d 1200, 1204–05 (8th Cir.1992)). Claimants contend that the Government's Complaint does not comply with Supplemental Rule E(2) because it is not detailed enough. However, given the Court's interpretation of CAFRA and its relationship to other existing rules and statutory provisions affecting civil forfeiture proceedings, it would appear to the Court that the

---

**6.** Although the Court reads 18 U.S.C. § 983(a)(3)(D) as giving the Government some leeway at the motion to dismiss stage, the provision cannot be read so as to allow the Government to proceed to final judgment in a forfeiture proceeding without some measure of proof to substantiate its claim. Protection from such a result is provided by the heightened standard of proof within CAFRA that requires the Government to establish by a "preponderance of the evidence" that the "property is subject to forfeiture." 18 U.S.C. § 983(c).

particularity requirements for a forfeiture complaint set out in Supplemental Rule E(2) must also be viewed in a more relaxed manner on a case by case basis, particularly in face of the savings clause reference to "adequate evidence" in 18 U.S.C. § 983(a)(3)(D).

■ Notwithstanding the Court's previous discussion as to the effect of CAFRA on the Rules of Civil Procedure and statutory provisions affecting forfeiture proceedings, the actual impact of CAFRA at this stage on the case at hand may be minimum. This is so because, based upon the allegations within the Government's Complaint, the Court finds that the Government's claim could survive what may be viewed as the more difficult standard applied in connection with a Rule 12(b)(6) motion to dismiss in a proceeding not involving forfeiture. Accepting as true all of the Government's well-pled allegations, the Court finds that the Government has pled its claim for forfeiture against the Ardmore property with sufficient particularity and has alleged a set of facts that would entitle the Government to relief so as to preclude a favorable ruling for Claimants on their motion to dismiss for failure to state a claim. Fed.R.Civ.P. Supplemental Rule E; *Conley*, 355 U.S. at 45–46, 78 S.Ct. at 102, 2 L.Ed.2d at 84. Specifically, as shown by the detailed facts described earlier, the Government's Complaint for forfeiture of the Ardmore property adequately asserts the likelihood that Maurice Harris either purchased the Ardmore property with drug proceeds or used the Ardmore property to further his drug operation. . There is no question that the Government has alleged that it has substantial evidence of Maurice Harris's own involvement in drug trafficking activity. This is borne out by the Government's allegation, if taken as true, that Maurice Harris was perhaps the ringleader and supplier of the Harris drug operation. More specifically, it is alleged that on more than one occasion various confidential sources observed and dealt with Maurice Harris and members of his family in the drug business at least as far back as the year 1990.

Although Claimants contend that the Ardmore property was never observed to be the site of a drug transaction, the Government makes a reasonable assertion that, in light of Harris's alleged practice of using his other real estate holdings to conduct his drug organization, Maurice Harris similarly used the Ardmore property to facilitate his drug business, particularly since the Ardmore property served as his principal place of residence. To demonstrate that Maurice Harris resided at the Ardmore property, the Government points to statements made by Harris's own family at the time of his death that the Ardmore property was Maurice Harris's home.[7] (Pl.'s Compl., Gov.Ex. A at 14–17.) The assertion that the Ardmore property was his residence is also bolstered by the fact that Harris himself indicated on a credit application that he had resided at the Ardmore property since September, 1992, which just happens to be approximately ten months before the Claimants are alleged to have purchased the property. As further evidence, the record reveals that Harris listed the Ardmore property address as either his residence or return

---

7. For the purposes of Rule 12(b) motions, the Court must confine its consideration to the pleadings. However, Rule 10(c) states that a written document attached as an exhibit to a pleading, like the deposition of Officer Jeff G. Lamb ("Lamb Deposition") that the Government appended to its complaint, "is a part" of the pleading "for all purposes." For that reason, it is proper for the Court to consider for this motion's purpose the Government's complaint as expanded by the Lamb Deposition.

mailing address on the deeds for the nine other Properties purchased between 1994 and 1999, three of which were observed to be the site of actual drug activity.[8]

Similarly, the Government has sufficiently alleged a claim that Maurice Harris's drug operation served as the source of funding for all of the Properties, including 630 Ardmore. Specifically, over a six-year period, Maurice Harris purchased, allegedly with drug proceeds, and titled in his name at least nine of the Properties. These multiple purchases within a limited period of time, when Harris was not properly licensed for the real estate business and was engaging in illegal drug trafficking activity, can be viewed as demonstrating that the funds for these purchases came from illegal drug proceeds. Although the tenth property, the Ardmore property, was not titled in Harris's name, the Government raises the implication that it was also purchased or improved with illegal funds, given that Maurice Harris resided at the Ardmore property for over seven years. Accepting, as it must, that these allegations are true, the Court finds that these facts suggest that drug proceeds funded Harris's real estate holdings. Based on these alleged facts, the Government's assertions support its claim that Maurice Harris purchased the Properties, including the Ardmore property, with drug proceeds or used the Ardmore property to facilitate his illegal operation. (Pl.'s Compl., Gov.Ex. A, at 18–20.)

The fact that the Ardmore property was not titled in Maurice Harris's name, but rather in the names of the Claimants, does not warrant dismissal of the Government's case. In civil forfeiture proceedings, "legal title to property in an entity other than the drug trafficker does not of itself insu-late that property." *United States v. A Single Family Residence and Real Property Located at 900 Rio Vista Blvd.*, 803 F.2d 625, 630 (11th Cir.1986). In fact, forfeiture under the civil forfeiture statutes does not even require that the forfeitable property be owned by the person committing the illegal acts, as long as the property either facilitated the commission of a drug-related crime or was purchased with proceeds. 21 U.S.C. § 881(a)(6)–(7). While it is also true that a property owner, with no involvement or information about the alleged drug activity, may assert the "innocent owner" defense to keep the property, this is an affirmative defense that the Government need not disprove in its Complaint. 18 U.S.C. § 983(d). Allowing drug traffickers to shelter their profits by placing the legal title to their property and possessions in the names of uninvolved third parties "would foster manipulation of ownership of persons engaged in criminal activity." *United States v. Morgan*, 224 F.3d 339, 343 (4th Cir.2000).

Similarly, the Claimants' allegation that the property was purchased with their own, untainted, social security funds does not necessitate dismissing the case. Although Claimants assert that they purchased the property with this alternative source of funds, they do not offer the sort of conclusive proof needed at this stage to demonstrate that the social security money was directly funneled into the Ardmore property. Based on the information currently before the Court, the Court cannot find that the Government presented no set of facts that could support its claim for forfeiture based upon its allegation of a connection between the Ardmore property and Maurice Harris's drug operation or drug proceeds. As a result, although

---

8. The three Properties known to have been sites of drug activity for Harris's organization included 314 Wake Place, 1117 Eva Street, and 112 South Hyde Park Avenue, all in Durham, North Carolina.

the Court interprets the CAFRA provisions in 18 U.S.C. § 983(a)(3)(D) to create, on a case by case basis, a more relaxed standard for consideration of a motion to dismiss a complaint for civil forfeiture proceedings, the Court finds that, in this instant case, given the allegations of the Government's claim, the Government's Complaint could survive a motion to dismiss based on the traditional Rule 12(b)(6) analysis. For these reasons, the Claimants' motions to dismiss, in as far as they allege a failure to state a claim, are DENIED.

## III. CONCLUSION

For the reasons stated above, and in particular, based upon the lack of showing of any prejudice suffered by Claimant LaBonne Hunter as to the Government's failure to include a notice of complaint in its service, Claimant LaBonne Hunter's Motion to Dismiss 630 Ardmore for Insufficiency of Process and/or Service of Process and Failure to State a Claim [Document # 18] is DENIED. In addition, Claimant LaTeasha Hunter's Motion to Dismiss 630 Ardmore for Failure to State a Claim [Document # 35] is DENIED.

### ORDER

For the reasons stated in the Memorandum Opinion filed contemporaneously herewith,

IT IS HEREBY ORDERED that LaBonne Hunter's Motion to Dismiss Defendant Property 630 Ardmore Drive, Durham, N.C., for Insufficiency of Process and/or Insufficiency of Service of Process and Failure to State a Claim [Document # 18] is DENIED;

IT IS FURTHER ORDERED that LaTeasha Hunter's Motion to Dismiss Defendant Property 630 Ardmore Drive, Dur-

ham, N.C., for Failure to State a Claim [Document # 35] is DENIED.